In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

Nos. 17-3508 & 18-2199

MARK RICHARDSON,

*Plaintiff-Appellant,*

*v.*

CHICAGO TRANSIT AUTHORITY,

*Defendant-Appellee.*

———————————

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 16-cv-03027— **John Robert Blakey**, *Judge.*

———————————

ARGUED MAY 14, 2019 — DECIDED JUNE 12, 2019

———————————

Before FLAUM, KANNE, and SCUDDER, *Circuit Judges.*

FLAUM, *Circuit Judge.* Mark Richardson, a former Chicago Transit Authority ("CTA") bus operator, alleged CTA took adverse action against him because of his extreme obesity in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101–12213, as amended by the ADA Amendments Act of 2008 ("ADAAA"), Pub. L. No. 110-325, 122 Stat. 3553. The district court disagreed. It held extreme obesity only qualifies as a disability under the ADA if it is

caused by an underlying physiological disorder or condition, and granted CTA's motion for summary judgment because Richardson offered no such evidence. Richardson appeals this holding, as well as the district court's decision to tax costs against him. We affirm.

## I. Background

Mark Richardson began working for CTA in 1993 as a temporary bus operator, and he worked as a full-time operator from August 1999 until February 2012. According to a CTA doctor, Richardson weighed 350 pounds in January 2005. And another CTA doctor indicated Richardson weighed 566 pounds in May 2009. Based on his Body Mass Index (a standardized weight-to-height ratio used to determine whether an individual is underweight, within the normal weight range, overweight, or obese) Richardson has "extreme" obesity whenever he weighs over 315 pounds. He also suffers from hypertension and sleep apnea.

Beginning in early February 2010, Richardson was absent from work because he had the flu. He attempted to return to work on February 19, but Advanced Occupational Medicine Services ("AOMS")—CTA's third-party medical provider—documented that Richardson had uncontrolled hypertension and influenza, weighed over 400 pounds, and could not return to work until he controlled his blood pressure. For that reason, on April 9, CTA's Disability Review Committee transferred Richardson to Temporary Medical Disability–Area 605 ("Area 605"). CTA administrative procedures define Area 605 as a "budgetary assignment for eligible union employees who have been found medically unfit to perform the essential functions of their job classification due to an illness or injury."

On September 13, 2010, AOMS examined Richardson's fitness to return to work. It found Richardson "physically fit to work as a bus operator," but indicated Richardson "must be cleared by safety prior to operating [a] bus." CTA requires AOMS to report if a bus operator returning from extended leave weighs over 400 pounds because CTA bus seats are not designed to accommodate drivers weighing over 400 pounds. Weighing over this maximum does not, however, automatically disqualify employees from working as bus operators. CTA permits such employees to operate buses if the safety department finds they can safely perform their job. To make this determination, CTA administers a "special assessment," a driving performance test used to determine whether bus operators can perform all standard operating procedures on six types of CTA buses.

On September 16, 2010, Richardson completed a special assessment. CTA's Acting Manager of Bus Instruction, Marie Stewart, assigned Bus Instructors John Durnell and Elon McElroy to administer the test. During the assessment, Durnell and McElroy joked about Richardson's weight. Durnell testified he was just trying "to lighten up the situation," and asserted that in response, Richardson "started laughing and he started to relax." Nevertheless, McElroy reported Durnell's comments to Stewart, and Stewart reprimanded Durnell for unprofessionalism.

Following the assessment, Durnell and McElroy each completed a report. While Durnell concluded Richardson "can drive all of CTA's buses in a safe and trusted manner," both instructors noted several safety concerns: Richardson cross-pedaled, meaning his foot was on the gas and brake at the same time; Richardson was unable to make hand-over-hand

turns; Richardson's leg rested close to the door handle; Richardson could not see the floor of the bus from his seat; part of Richardson's body hung off the driver's seat; and the seat deflated when Richardson sat. Additionally, both instructors noted Richardson wore a seatbelt extender, wrote that Richardson was "sweating heavily" and needed to lean onto the bus for balance, and Durnell commented on a "hygiene problem." At his deposition, McElroy testified that as a "former heart patient," he was worried Richardson's "sweating [could] lead to an episode."

Stewart drafted a memorandum to CTA's Vice President of Bus Operations, Earl Swopes, concluding that "[b]ased on the Bus Instructors['] observations and findings, the limited space in the driver's area and the manufacturer requirements, it would be unsafe for Bus Operator Richardson to operate any CTA bus at this time." She specifically referenced the safety concerns listed above. Moreover, Stewart wrote that "[t]he maximum allowable weight per the manufacturer requirements for CTA buses is 400 pounds," and "[i]t has been represented that Operator Richardson is over that weight maximum." Because Richardson failed the assessment and could not adhere to all CTA operating procedures, Swopes determined that Richardson could not safely operate CTA buses. Swopes testified he based this decision solely on Stewart's memorandum, without any independent investigation.

Instead of immediately terminating Richardson's employment, CTA proposed a written agreement: CTA would transfer Richardson back to Area 605 so he could work with doctors to lose weight and be subject to periodic monitoring; in exchange, Richardson would release his ability to bring various causes of action. Richardson refused. In March 2011, CTA

nonetheless transferred Richardson to Area 605; the accompanying form provides as a rationale that Richardson "exceeded the weight requirement to operate the bus." In October 2011, CTA informed Richardson that he was approaching two years of inactive status, and per CTA policy, he could extend his time in Area 605 by one year by submitting medical documentation. Richardson did not submit documentation, and in February 2012, CTA terminated his employment.

On December 15, 2015, the Equal Employment Opportunity Commission ("EEOC") issued Richardson a right-to-sue letter, and on March 10, 2016, Richardson brought the operative complaint against CTA, alleging it violated the ADA by "refus[ing] to allow [him] to return to work because it regarded him as being too obese to work as a bus operator." On October 17, 2016, the district court denied CTA's motion to dismiss, ruling that "[e]ven if [Richardson] is ultimately required to *prove* that his obesity was caused by a physiological disorder, he is not required to *allege* the same." On April 20, 2017, Richardson and CTA filed cross-motions for summary judgment, and on November 13, 2017, the district court denied Richardson's motion and granted CTA's motion. It held, based on the language of the ADA and the pertinent EEOC regulation and interpretive guidance, that "to qualify as a protected physical impairment, claimants under the ADA must show that their severe obesity is caused by an underlying physiological disorder or condition." Because Richardson presented no such evidence, the district court entered judgment in CTA's favor.

On December 7, 2017, CTA filed its bill of costs, seeking to recover $7,333.56 in deposition and copying costs as the prevailing party pursuant to Federal Rule of Civil Procedure

54(d)(1). Richardson argued costs should not be taxed because of his inability to pay, or alternatively, CTA's costs should be reduced because transcript delivery fees are not recoverable and the transcript costs CTA sought were over the rate allowed by local rules. On May 1, 2018, the district court issued a minute order taxing $2,067.26 in costs. It denied copying costs because the documents were available on the electronic docket, and it reduced deposition transcript costs.

Richardson separately appealed the district court's grant of CTA's motion for summary judgment and decision to tax costs. We consolidated the appeals for resolution.

## II. Discussion

### A. The ADA and Obesity

We review cross-motions for summary judgment de novo, "construing all facts and drawing all reasonable inferences in favor of the party against whom the motion under consideration was filed." *Hess v. Bd. of Trs. of S. Ill. Univ.*, 839 F.3d 668, 673 (7th Cir. 2016). Here, we consider only CTA's motion for summary judgment, so we draw all facts in favor of Richardson. Summary judgment is proper "where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Id.* (citing Fed. R. Civ. P. 56(a)).

The ADA prohibits employers from "discriminat[ing] against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). To succeed on an ADA claim, an employee must show: "(1) he is disabled; (2) he is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) the adverse job action was caused by his disability." *Roberts v. City of Chicago*, 817 F.3d 561, 565 (7th Cir. 2016).

The ADA defines disability as: "(A) a physical or mental impairment that substantially limits one or more major life activities of [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). Richardson focuses his claim on the "regarded as" prong. To succeed, he must establish he was subject to a prohibited employment action "because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." *Id.* § 12102(3)(A). At issue here, then, is whether Richardson can demonstrate either: (1) his extreme obesity is an actual impairment; or (2) CTA perceived his extreme obesity to be an impairment.

### 1. *Actual Impairment*

Congress has not defined "impairment." In a regulation implementing the ADA, however, the EEOC defined "physical impairment" as: "Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine." 29 C.F.R. § 1630.2(h)(1). EEOC regulations interpreting the ADA are entitled to deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, unless they are "arbitrary, capricious, or manifestly contrary to the statute." 467 U.S. 837, 844 (1984); *see Sutton v. United Air Lines, Inc.*, 130 F.3d 893, 899 n.3 (10th Cir. 1997).

Richardson and CTA disagree about whether his extreme obesity—even without evidence of an underlying physiological condition—meets the definition of physical impairment

and is thus an actionable disability for ADA purposes. This is an issue of first impression for this Circuit. However, three of our sister circuits have considered the question; each has held, based on the language of 29 C.F.R. § 1630.2(h)(1), that obesity is an ADA impairment *only* if it is the result of an underlying "physiological disorder or condition." *See Morriss v. BNSF Ry. Co.*, 817 F.3d 1104, 1108–13 (8th Cir.), *cert. denied*, 137 S. Ct. 256 (2016); *EEOC v. Watkins Motor Lines, Inc.*, 463 F.3d 436, 441–43 (6th Cir. 2006); *Francis v. City of Meriden*, 129 F.3d 281, 286–87 (2d Cir. 1997).[1] The majority of district courts have also expressed this view.[2] In contrast, only a small number of district courts have held extreme obesity is an ADA impairment even without evidence of a physiological cause. *See, e.g.*, *Velez v. Cloghan Concepts, LLC*, No. 18-cv-1901, 2019 WL 2423145, at *4 (S.D. Cal. June 10, 2019); *Velez v. II Fornanio (Am.) Corp.*, No. 18-cv-1840, 2018 WL 6446169, at *2–4 (S.D. Cal. Dec. 10, 2018); *McCollum v. Livingston*, No. 14-cv-3253, 2017 WL 608665, at

---

[1] The Ninth Circuit has acknowledged that "the scope of ADA protection for individuals suffering from obesity … presents an open question of federal law in this circuit," but it has not had to resolve the issue. *Taylor v. Burlington N. R.R. Holdings, Inc.*, 904 F.3d 846, 851–53 (9th Cir. 2018).

[2] *See, e.g.*, *Sturgill v. Norfolk S. Ry. Co.*, No. 18-cv-566, 2019 WL 1063374, at *3–4 (E.D. Va. Mar. 6, 2019); *Shell v. Burlington N. Santa Fe Ry. Co.*, No. 15-cv-11040, 2018 WL 1156249, at *3 (N.D. Ill. Mar. 5, 2018); *Brownwood v. Wells Trucking, LLC*, No. 16-cv-01264, 2017 WL 9289453, at *6 (D. Colo. Nov. 9, 2017); *Silva v. Bd. of Cty. Comm'rs for the Cty. of Roosevelt*, No. 15-cv-1046, 2017 WL 4325769, at *7–8 (D.N.M. Sept. 26, 2017); *Valtierra v. Medtronic Inc.*, 232 F. Supp. 3d 1117, 1123–25 (D. Ariz. 2017); *Revolinski v. Amtrak*, No. 08-cv-1098, 2011 WL 2037015, at *11 (E.D. Wis. May 24, 2011); *Hayes v. Wal-Mart Stores, Inc.*, 781 F. Supp. 2d 1080, 1091 (D. Or. 2011); *Ni v. Rite Aid of N.J.*, No. 10-cv-1522, 2010 WL 2557523, at *3 (D.N.J. June 22, 2010); *Hill v. Verizon Md., Inc.*, No. 07-cv-3123, 2009 WL 2060088, at *6 (D. Md. July 13, 2009).

*35 (S.D. Tex. Feb. 3, 2017); *EEOC v. Res. for Human Dev., Inc.*, 827 F. Supp. 2d 688, 693–95 (E.D. La. 2011); *Lowe v. Am. Eurocopter, LLC*, No. 10-cv-24, 2010 WL 5232523, at *7–8 (N.D. Miss. Dec. 16, 2010).[3] We join the Second, Sixth, and Eighth Circuits. Without evidence that Richardson's extreme obesity was caused by a physiological disorder or condition, his obesity is not a physical impairment under the plain language of the EEOC regulation.

In his arguments to the contrary, Richardson focuses first on the ADAAA. Congress passed these amendments in 2008 to ensure that the ADA's "definition of disability … be construed in favor of broad coverage." 42 U.S.C. § 12102(4)(A). Congress emphasized "that the primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations," while "the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis." ADAAA § 2(b)(5), 122 Stat. at 3554.

Specifically, Congress sought to broaden the scope of the "being regarded as having such an impairment" definition of disability. *Id.* § 2(b)(3); *see Miller v. Ill. Dep't of Transp.*, 643 F.3d 190, 196 (7th Cir. 2011) ("[T]he 'regarded as' prong is an important protection that should not be nullified by creating an impossibly high standard of proof, as Congress indicated even more strongly in the 2008 amendments."). It rejected the Supreme Court's decision in *Sutton v. United Air Lines, Inc.*,

---

[3] The Montana Supreme Court reached a similar conclusion, discussing the ADA when interpreting the analogous Montana law. *BNSF Ry. Co. v. Feit*, 281 P.3d 225, 230–31 (Mont. 2012).

527 U.S. 471 (1999), which held that to be regarded as disabled, an employee's disability must substantially limit a major life activity. *See id.* at 490 ("An employer runs afoul of the ADA when it makes an employment decision based on a physical or mental impairment, real or imagined, that is regarded as substantially limiting a major life activity."). Therefore, Congress amended the ADA to make clear an individual can be "regarded as" having an impairment "whether or not the impairment limits or is perceived to limit a major life activity," 42 U.S.C. § 12102(3)(A), and the EEOC adopted regulations to the same effect. *See* 29 C.F.R. § 1630.2(j)(2) ("Whether an individual's impairment 'substantially limits' a major life activity is not relevant to coverage under … the 'regarded as' prong."); *id.* § 1630.2(l)(1).

Additionally, Congress relaxed court-imposed rules as to how severe an impairment must be to be considered a disability. It sought to abrogate the Supreme Court's decisions in *Sutton* and *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002), because the Court's definition of "substantially limits a major life activity" in those cases "created an inappropriately high level of limitation necessary to obtain coverage under the ADA" by requiring that employees have an impairment that "severely restrict[ed]" a major life activity. ADAAA § 2(b)(2)–(5), 122 Stat. at 3554.[4] It found that

---

[4] *See Toyota*, 534 U.S. at 197–98 (holding "substantially" and "major" "need to be interpreted strictly to create a demanding standard for qualifying as disabled," and therefore, to be disabled "an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives"); *Sutton*, 527 U.S. at 482–83 ("A person whose physical or mental impairment is corrected by medication or other measures does not have an impairment that presently 'substantially limits' a major life activity.").

EEOC regulations "defining the term 'substantially limits' as 'significantly restricted' [were] inconsistent with congressional intent[] by expressing too high a standard," and expressed its "expectation" that the EEOC would revise its regulations. *Id.* § 2(a)(8), (b)(6). The EEOC adhered to this directive. *See* 29 C.F.R. § 1630.2(j)(1)(ii) ("An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting."); *id.* § 1630.2(i)(2) ("[T]he term 'major' shall not be interpreted strictly to create a demanding standard for disability.").

Richardson contends that after the ADAAA, courts must broadly construe impairment to encompass extreme obesity, even without evidence of an underlying physiological condition. *Cf. EEOC v. BNSF Ry. Co.*, 902 F.3d 916, 923 (9th Cir. 2018) ("impairment" should be interpreted "broadly" after the ADAAA). We disagree. While Congress criticized the Supreme Court's understanding of "substantially limits a major life activity" at length, it said nothing about judicial interpretation of impairment. *See Morriss*, 817 F.3d at 1111. Likewise, while Congress instructed the EEOC to alter its definitions of "substantially limits" and "major life activity," it made no such instruction with respect to the EEOC's definition of impairment. *See id.* Indeed, the ADAAA's legislative history explicitly states that Congress "expect[ed] that the currently regulatory definition of [physical or mental impairment], as promulgated by agencies such as the [EEOC] … [would] not change." Statement of the Managers to Accompany S. 3406, The Americans with Disabilities Act Amendments Act of 2008, 154 Cong. Rec. S8342-01, S8345 (Sept. 11, 2008). The EEOC therefore did not modify its regulation defining im-

pairment, and even after the ADAAA, the definition of phys-
ical impairment remains inextricably tied to a "physiological
disorder or condition." 29 C.F.R. § 1630.2(h)(1); *see Morriss*,
817 F.3d at 1111 ("The ADAAA's general policy statement
cannot trump this plain language.").

Next, Richardson insists that we must interpret the
EEOC's definition of physical impairment in light of EEOC
interpretive guidance. That guidance, which interprets both
the ADA and the EEOC regulation, states:

> It is important to distinguish between condi-
> tions that are impairments and physical, psy-
> chological, environmental, cultural, and eco-
> nomic characteristics that are not impairments.
> The definition of the term "impairment" does
> not include physical characteristics such as eye
> color, hair color, left-handedness, or height,
> weight, or muscle tone that are within "normal"
> range and are not the result of a physiological
> disorder.

29 C.F.R. pt. 1630, app. § 1630.2(h). While EEOC interpretive
guidance is "not entitled to full *Chevron* deference," it does
"reflect a body of experience and informed judgment to which
courts and litigants may properly resort for guidance" and is
therefore "entitled to a measure of respect under the less def-
erential *Skidmore* [*v. Swift & Co.*, 323 U.S. 134 (1944)] stand-
ard." *Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 399 (2008)
(citations and internal quotation marks omitted); *see Gile v.
United Airlines, Inc.*, 95 F.3d 492, 497 (7th Cir. 1996).

According to Richardson, this EEOC guidance specifies
that "impairment does *not* include the physical characteristic

of weight if both of the following elements are present: (1) the weight [is] within the normal range; *and* (2) the weight is *not* the result of a physiological disorder." The Montana Supreme Court adopted this interpretation. *BNSF Ry. Co. v. Feit*, 281 P.3d 225, 229 (Mont. 2012). So did at least three district courts. *See Velez*, 2019 WL 2423145, at *4; *Velez*, 2018 WL 6446169, at *4; *Res. for Human Dev.*, 827 F. Supp. 2d at 694. Removing the negatives, Richardson posits that "[i]mpairment *does* include the physical characteristic of weight if either of the following elements are true: (1) the weight is *not* within the normal range; *or* (2) the weight *is* the result of a physiological disorder."

Like the Eighth Circuit, we do not find this reading of the interpretive guidance persuasive. Rather, "a more natural reading of the interpretive guidance is that an individual's weight is generally a physical characteristic that qualifies as a physical impairment only if it falls outside the normal range *and* it occurs as the result of a physiological disorder." *Morriss*, 817 F.3d at 1108. As the Eighth Circuit reasoned, "reading … the EEOC interpretive guidance in its entirety supports this conclusion" because, for example, "the interpretive guidance also provides that '[o]ther conditions, such as pregnancy, that are not the result of a physiological disorder are also not impairments.'" *Id.* at 1108–09 (alteration in original) (quoting 29 C.F.R. pt. 1630, app. § 1630.2(h)).

Moreover, Richardson's preferred interpretation is overbroad. If we were to read the EEOC interpretive guidance in the way he suggests, even an employee with normal weight could claim a weight-based physical impairment if his weight was the result of a physiological disorder. Likewise, any employee whose weight—or other physical characteristic—is

even slightly outside the "normal range" would have a physical impairment even with no underlying physiological cause. Such results are inconsistent with the ADA's text and purpose and must be rejected. Otherwise, "the 'regarded as' prong … would become a catch-all cause of action for discrimination based on appearance, size, and any number of other things far removed from the reasons the [ADA] [was] passed." *Watkins*, 463 F.3d at 443 (quoting *Francis*, 129 F.3d at 287).

In any event, even if this interpretive guidance means what Richardson says it means, we do not defer to EEOC guidance that is contrary to the text of the regulation it purports to interpret. *See Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012) ("Deference is undoubtedly inappropriate … when the agency's interpretation is 'plainly erroneous or inconsistent with the regulation.'" (quoting *Auer v. Robbins*, 519 U.S. 452, 461 (1997))). The EEOC defines physical impairment as a "physiological disorder or condition." 29 C.F.R. § 1630.2(h)(1). It is directly contrary to that definition to consider a physical characteristic such as weight, even if outside the "normal range," a physical impairment absent evidence of an underlying physiological condition.[5]

---

[5] Richardson also emphasizes the EEOC has consistently expressed its view that extreme obesity is a physical impairment. In a compliance manual, the EEOC stated that while "[b]eing overweight, in and of itself, generally is not an impairment …, severe obesity, which has been defined as body weight more than 100% over the norm, is clearly an impairment." EEOC Compliance Manual § 902.2(c)(5)(ii) (2012) (citations and footnotes omitted). The EEOC has also taken this position in litigation, both as plaintiff and amicus. True, courts may generally defer to both EEOC policy statements in a compliance manual and EEOC's interpretation of its own regulation in legal briefs. *Christopher*, 567 U.S. at 155; *Holowecki*, 552 U.S. at 399; *see Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 663 (7th Cir.

Patient and scientific professional organizations, as amici curiae, make a somewhat related, but distinct argument. They insist that because both the medical community[6] and federal and state policymakers[7] understand obesity as a disease, obesity is *in and of itself* a physiological disorder and therefore a

---

2015) (Flaum, J., concurring in part and concurring in the judgment) ("[I]t is generally appropriate to defer to an agency's interpretation of its own regulations, even when that interpretation is informally announced."). Here, however, neither the compliance manual nor EEOC's litigation position are entitled to our deference. For one, the EEOC removed this paragraph from its compliance manual in 2012. *See* EEOC, Section 902 Definition of the Term Disability (2012), https://www.eeoc.gov/policy/docs/902cm.html. And more importantly, the EEOC's position is in direct conflict with the regulation because it considers extreme obesity a physical impairment even without evidence of an underlying physiological disorder or condition. *See Morriss*, 817 F.3d at 1111 n.4, 1112.

[6] For example, the American Medical Association describes "obesity as a disease state with multiple pathophysiological aspects requiring a range of interventions to advance obesity treatment and prevention." Am. Med. Assoc. House of Delegates, *Recognition of Obesity as a Disease* (2013), https://www.npr.org/documents/2013/jun/ama-resolution-obesity.pdf. Likewise, the World Health Organization concluded "obesity should be considered a disease in its own right." World Health Org., *Obesity and Overweight* (2003), http://www.who.int/dietphysicalactivity/media/en/gsfs_obesity.pdf. And the National Institutes of Health said "[o]besity is a complex, multifactorial chronic disease." Nat'l Insts. of Health, *Clinical Guidelines on the Identification, Evaluation, and Treatment of Overweight and Obesity in Adults*, at xi (1998), https://www.nhlbi.nih.gov/files/docs/guidelines/ob_gdlns.pdf.

[7] For instance, the Internal Revenue Service decided an individual could deduct costs of a weight-loss program as a medical care expense because he had "a disease, obesity," I.R.S. Rev. Rul. 2002-19, 2002 WL 484628 (Apr. 2, 2002), and the Social Security Administration recognized obesity as "a complex, chronic disease characterized by excessive accumu-

physical impairment within the definition of the ADA. This argument is not persuasive. The ADA is an antidiscrimination—not a public health—statute, and Congress's desires as it relates to the ADA do not necessarily align with those of the medical community. Moreover, amici's argument proves too much; if we agreed that obesity is itself a physiological disorder, then *all* obesity would be an ADA impairment. While Richardson does not ask us to hold that all obese individuals—found to be as high as 39.8% of the American adult population[8]—automatically have an ADA impairment, adopting amici's position leads to this unavoidable, nonrealistic result.

At bottom, Richardson does not present any evidence suggesting an underlying physiological disorder or condition caused his extreme obesity.[9] Without such evidence, we cannot call Richardson's extreme obesity a physical impairment

---

lation of body fat." SSR 00-3p, 2000 WL 33952015 (May 15, 2000). Additionally, in 2017, the Senate passed by unanimous consent a resolution in support of "National Obesity Care Week," recognizing "the disease of obesity," S. Res. 325, 115th Cong. (2017), and in 2018, the National Lieutenant Governors Association passed a resolution which called obesity "a chronic disease." Nat'l Lieutenant Governors Ass'n, *Resolution in Support of the Treatment and Prevention of Obesity* (June 29, 2018), https://www.nlga.us/wp-content/uploads/2018-Resolution-in-Support-of-the-Prevention-and-Treatment-of-Obesity-2.pdf.

[8] *See* U.S. Dep't of Health & Human Servs., *Prevalence of Obesity Among Adults and Youth: United States, 2015–2016* (Oct. 2017), https://www.cdc.gov/nchs/data/databriefs/db288.pdf.

[9] True, Richardson's pulmonologist submitted a declaration stating Richardson's hypertension and sleep apnea were "related to" his obesity. However, there is nothing in the record suggesting Richardson's hypertension or sleep apnea *caused* his obesity.

within the meaning of the ADA and the EEOC regulation. *See Morriss*, 817 F.3d at 1112; *Watkins*, 463 F.3d at 443.[10]

### 2. *Perceived Impairment*

Alternatively, Richardson argues that even if we hold extreme obesity is not itself an impairment, he is still disabled under the ADA because CTA *perceived* his obesity to be a physical impairment. *See* 42 U.S.C. § 12102(3)(A). To succeed on this claim, Richardson must show CTA took adverse action against him based on the belief that his condition was an impairment—as the ADA defines that term—not merely based on knowledge of Richardson's physical characteristic. *See Morriss*, 817 F.3d at 1113 ("[A]s a threshold matter, [the employee] was required to show that [the employer] perceived his obesity to be a condition that met the definition of 'physical impairment.'"); *Francis*, 129 F.3d at 285 ("[T]he plaintiff must allege that the employer believed, however erroneously,

---

[10] Richardson also suggests the fact that he "suffered from extreme obesity … alone is sufficient … to establish that he meets the definition of 'disability' under the ADA." *Cf. Watkins*, 463 F.3d at 443–45 & n.1 (Gibbons, J., concurring) (opining that "[i]t is possible that morbid obesity is a disorder that by its very nature has a physiological cause," but agreeing summary judgment was proper because the plaintiff put forth no evidence to that effect); *Cook v. State of R.I., Dep't of Mental Health, Retardation, & Hosps.*, 10 F.3d 17, 23 (1st Cir. 1993) (concluding a jury could find that plaintiff's "morbid obesity" was a "physical impairment" because "she presented expert testimony that morbid obesity is a physiological disorder involving a dysfunction of both the metabolic system and the neurological appetite-suppressing signal system, capable of causing adverse effects within the musculoskeletal, respiratory, and cardiovascular system"). We need not decide whether, on a particular evidentiary showing, extreme obesity alone can be considered a physiological condition because Richardson presented no such evidence.

that the plaintiff suffered from an 'impairment' that, if it truly existed, would be covered under the [ADA] ...."). In other words, Richardson must present sufficient evidence to permit a reasonable jury to infer that CTA perceived his extreme obesity was caused by an underlying physiological disorder or condition.

Richardson did not make this showing. To be sure, Richardson introduced evidence that CTA took adverse action against him based on his excessive weight. For example, CTA transferred Richardson to Area 605 because he exceeded the weight specifications for CTA buses. Additionally, CTA required Richardson to take a special assessment because he weighed over 400 pounds, not because of any violation of CTA standard operating procedures. And in Stewart's memorandum to Swopes summarizing the results of the special assessment, she highlighted safety concerns directly related to Richardson's weight: he could not perform hand-over-hand turning, he cross-pedaled, he had difficulty getting in and out of the driver's seat, his body hung off the seat, his leg was close to the door handle, and he exceeded the 400-pound maximum per CTA bus manufacturer requirements. But there is no evidence Stewart, Swopes, or anyone else at CTA believed Richardson's excessive weight was caused by a physiological disorder or condition. To the contrary, the evidence suggests CTA perceived Richardson's weight as a physical characteristic that made it unsafe for him to drive. These facts do not permit a finding that CTA regarded Richardson as disabled for purposes of ADA liability. *See Francis*, 129 F.3d at 287 (no liability where plaintiff "alleges only that [defendant] regarded him as disabled because it disciplined him for failing to meet a weight standard applied to all of its employees," and not

"because it perceived him as suffering from a physiological weight-related disorder").

Richardson cites to the First Circuit's opinion in *Cook v. State of Rhode Island, Department of Mental Health, Retardation, & Hospitals*, 10 F.3d 17 (1st Cir. 1993), and suggests that the court held a jury could find an employer perceived an employee's extreme obesity as a physical impairment merely because the employer "stated concerns about the plaintiff's ability to perform her job duties." Richardson reads *Cook* too broadly. In *Cook*, the court affirmed a jury verdict in favor of the plaintiff under the identical "perceived disability" provision of the Rehabilitation Act. *Id.* at 23. The court explained that a jury could have found the defendant treated the plaintiff "as if she had a physical impairment" because the evidence "show[ed] conclusively that [the defendant] treated plaintiff's obesity as if it actually affected her musculoskeletal and cardiovascular systems." *Id.* Critically, the court emphasized that the plaintiff presented "expert testimony that morbid obesity is a physiological disorder." *Id.* Here, by contrast, Richardson presented no such evidence. The district court thus properly held that CTA could not have perceived Richardson as having a physical impairment within the ADA's definition.

### B. Costs

"Unless a federal statute, [the Federal Rules of Civil Procedure], or a court order provides otherwise, costs—other than attorney's fees—should be allowed to the prevailing party." Fed. R. Civ. P. 54(d)(1). "There is a presumption that the prevailing party will recover costs, and the losing party bears the burden of an affirmative showing that taxed costs are not appropriate." *Beamon v. Marshall & Ilsley Tr. Co.*, 411

F.3d 854, 864 (7th Cir. 2005). This presumption "is difficult to overcome" and therefore, "the district court's discretion is narrowly confined—the court must award costs unless it states good reasons for denying them." *Weeks v. Samsung Heavy Indus. Co.*, 126 F.3d 926, 945 (7th Cir. 1997). We reverse a district court's decision to award costs only after "a showing of clear abuse of discretion." *Id.*

We have held that "it is 'within the discretion of the district court to consider a plaintiff's indigency'" when taxing costs against him. *Rivera v. City of Chicago*, 469 F.3d 631, 634 (7th Cir. 2006) (quoting *Badillo v. Cent. Steel & Wire Co.*, 717 F.2d 1160, 1165 (7th Cir. 1983)). To deny costs based on indigency, the court must first "make a threshold factual finding that the losing party is 'incapable of paying the court-imposed costs at this time or in the future.'" *Id.* at 635 (quoting *McGill v. Faulkner*, 18 F.3d 456, 459 (7th Cir. 1994)). "The burden is on the losing party to provide the district court with sufficient documentation to support such a finding." *Id.* (internal quotation marks and citation omitted).

Richardson argues the district court abused its discretion because it "completely failed to consider or address [his] arguments and the evidence he submitted demonstrating his inability to pay the costs awarded at this time or in the future." We disagree. To be sure, "district judges [must] provide at least a modicum of explanation when entering an award of costs." *Cengr v. Fusibond Piping Sys., Inc.*, 135 F.3d 445, 454 (7th Cir. 1998). Here however, the court provided an explanation. It made clear that CTA was entitled to costs as the prevailing party, and it provided an accounting of how it calculated costs at $2,067.26 (significantly less than CTA's initial $7,333.56 request). True, the district court did not mention Richardson's

claim that he was indigent, but the indigence exception "is a narrow one" and "is not a blanket excuse for paying costs." *Rivera*, 469 F.3d at 635–36. While we have held that a district court abuses its discretion when it *denies* costs without explanation on the basis of indigence, *see id.* at 636–37, Richardson does not cite any case holding a district court abuses its discretion when it grants costs, with an explanation, but does not explicitly consider the plaintiff's indigence. It was thus not unreasonable for the district court to tax $2,067.26 in costs.

### III. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.