# Supreme Court of Texas

No. 22-0179

Texas Tech University Health Sciences Center – El Paso,

*Petitioner*,

v.

Dr. Lindsey Niehay,

*Respondent*

On Petition for Review from the
Court of Appeals for the Eighth District of Texas

**Argued February 21, 2023**

CHIEF JUSTICE HECHT delivered the opinion of the Court, in which Justice Devine, Justice Blacklock, Justice Busby, Justice Bland, Justice Huddle, and Justice Young joined.

JUSTICE BLACKLOCK filed a concurring opinion, in which Justice Devine and Justice Young joined.

JUSTICE BOYD filed a dissenting opinion, in which Justice Lehrmann joined.

The Texas Commission on Human Rights Act (TCHRA)[1] makes it unlawful for an employer to discriminate against an employee for being regarded as having an impairment. The question presented in this case is whether morbid obesity qualifies as an impairment under the TCHRA without evidence that it is caused by an underlying physiological disorder or condition. We hold that it does not. Accordingly, we reverse the judgment of the court of appeals and dismiss the case for want of jurisdiction.

**I**

After graduating from Texas Tech University School of Medicine in May 2015, Dr. Lindsey Niehay, 27, began a medical residency at the University's emergency-medicine department in El Paso. Dr. Radosveta Wells effectively ran the residency program under the supervision of the chair of the emergency-medicine department, Dr. John MacKay.[2] Throughout medical school and her residency, Niehay was morbidly obese.[3] During her residency, she weighed around four hundred

---

[1] TEX. LAB. CODE ch. 21.

[2] Shortly after Niehay started her residency, MacKay became chair of the emergency-medicine department and Wells became the program director of the department's residency program. It was soon determined, however, that Wells did not meet the requirements for the director position, so she was named the "associate program director" and MacKay was named the interim program director. Multiple people testified that MacKay served as the program director "in name" only and that Wells continued to function as the de facto program director.

[3] Morbid or Class III obesity is defined by a body mass index over 40. *Defining Adult Overweight & Obesity*, CDC, https://www.cdc.gov/obesity/basics/adult-defining.html (last visited June 23, 2023).

2

pounds.[4]

Approximately five months into Niehay's first year of residency, concerns arose regarding her performance. One of the professors and attending physicians, Dr. Sabrina Taylor, sent Wells an email entitled "Problem With a Resident". Taylor reported that she and Niehay had performed a procedure together over the weekend and that Niehay had "really struggled". Taylor said that Niehay was "sweating profusely, dyspneic[5] and had to take multiple breaks because of her inability to stand and at times bend over to gain the best access." Taylor "blame[d] it primarily on [Niehay's] habitus."[6] Taylor stated that she had to "correct [Niehay's] technique, because she kept getting distracted by all of the issues she was having." She was concerned about Niehay's ability to perform "physically challenging procedures" and "fear[ed] it could be problematic and quite dangerous." Taylor noted that "[i]t certainly doesn't instill the greatest amount of confidence in the patients she treats, as they see her suffer through, sweating and panting along the way." Taylor also reported that Niehay "seems to avoid being physically active in the sim[ulation] lab" and that she has to be "encourage[d]" to

---

[4] Niehay is 5'9" tall. Between 2012 and 2016, her weight steadily increased from 294.4 to up to 400.0 pounds, and her BMI from 43.99 to 59.07.

[5] Dyspneic is the adjective form of dyspnea, which is defined as "difficult or labored respiration". *Dyspnea*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/dyspnea (last visited June 23, 2023).

[6] Habitus is one's "body build and constitution especially as related to predisposition to disease". *Habitus*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/habitus (last visited June 23, 2023).

3

do invasive procedures.

In response, Wells solicited input from other attending physicians regarding issues they had experienced with Niehay, and other physicians expressed concerns. One physician found Niehay's motivation to be "less than optimal" and said that she was "unclear [about] how to evaluate basic patients." He also said that Niehay "pretty much stated [that] she hadn't been studying[]", and he found that to be "discouraging". Another physician found Niehay's performance during a recent procedure to be satisfactory, "perhaps exceeding her level of training", but noted that her sweating could pose a patient safety issue due to the potential for contamination of a sterile area.

Over the next several weeks, additional concerns arose. In late December, Niehay missed her shift and instead showed up as a patient in the emergency department where she was supposed to be working, complaining of "really bad heart palpitations." She failed to inform Wells of her absence until nearly 24 hours later. In January 2016, Wells learned that Niehay had self-prescribed a refill for her blood-pressure medication, in violation of University policy for residents. Shortly thereafter, Wells received an email from Dr. Adam Moore, a chief resident, reporting that Niehay opted not to perform a procedure on one of her patients because the proper size gown was not readily available to her. Instead, she allowed another intern to perform the procedure. Moore stayed an hour after his shift to assist with the procedure, but Niehay departed. Moore was concerned that Niehay was "giving away valuable procedures as an intern" and "not sticking around to take care of her patient."

4

After consulting with others, Wells recommended an emergency meeting of the Clinical Competency Committee to consider how best to respond to Niehay's issues. The Committee met and recommended that Wells place Niehay on a three-month probation with a remediation plan. Over the next two weeks, while Wells prepared the remediation plan, she continued to receive negative reports about Niehay's performance. For example, Dr. Priscilla Reyes gave Niehay low scores on an end-of-shift evaluation and told Wells that Niehay's "knowledge base appears to be very much lacking." The following week, Wells received emails from Reyes and two senior residents, Dr. Michael Tran and Dr. Brandon Charlton, regarding a central-line procedure that Niehay had recently performed. Reyes reported that Niehay was not exhibiting the appropriate level of urgency to begin the necessary, time-sensitive procedure. Charlton relayed that she seemed inexperienced and required some assistance during the procedure and that she became physically ill while performing it. Tran explained that Niehay "overheated" and noted that her reaction could be problematic in a Level 1 trauma room.

Wells and MacKay met with Niehay at the end of January and informed her that she would be placed on probation and under a remediation plan. Niehay responded by requesting a one-month leave of absence to give herself time for self-assessment and to demonstrate her good-faith desire to address any deficiencies. MacKay and Wells agreed to her request.

Niehay returned to her residency in March 2016. By the end of March, however, Wells had received additional reports from a number

5

of faculty members expressing similar concerns regarding Niehay's performance, attendance, professionalism, and patient care. In one incident, Niehay came into work but left within an hour with flu-like symptoms. She asked two other residents to see her patients for her and then departed. One of the residents who took over caring for her patients, Dr. Erin De La Cruz, reported to Wells via email that Niehay left unfinished notes and did not order labs for her patients, which posed a patient safety risk because the residents were unsure how much she had done and "something could have been missed."

De La Cruz also reported that there were at least two occasions in which Niehay declined to evaluate critically ill patients, creating a patient safety risk. In the first incident, a nurse came into the lounge and informed Niehay and De La Cruz that a patient had an elevated heart rate and was complaining of abdominal pain. Without evaluating the patient, Niehay instructed the nurse to give the patient fentanyl. De La Cruz went to see the patient and found that the patient also had rapid breathing and low oxygen levels and needed to be placed on a ventilator. De La Cruz stated that the patient "likely would have continued to decompensate" had she not gone to see him. In the other incident, a nurse reported to the doctors that a patient who had recently had surgery for a stab wound was vomiting. De La Cruz was busy and asked Niehay to evaluate him, and Niehay responded, "Well, what am I supposed to do about it?" After further pressure from De La Cruz, Niehay eventually saw the patient, and it was discovered that he had a small-bowel obstruction. De La Cruz ended her email by noting that "[i]t has been a very frustrating month as us other interns have had to

6

shoulder a lot of the burden [Niehay] has left."

Wells forwarded these reports to the Committee and proposed another emergency meeting. The Committee met and recommended that Niehay be suspended pending an investigation and evaluation of her post-leave performance. On April 19, 2016, the Committee recommended that Niehay be dismissed from the residency program. MacKay agreed with the recommendation and sent a letter to Niehay on April 25 notifying her of the recommendation. Niehay appealed, but the University's appeals panel upheld the recommendation and the University president agreed, dismissing Niehay from the program in May.

Niehay filed complaints of illegal discrimination with the Texas Workforce Commission and the federal Equal Employment Opportunity Commission (EEOC), both of which issued her "right to sue" letters. She then filed this suit, complaining that the University dismissed her because of her morbid obesity, which she asserts constitutes unlawful discrimination because of a disability under the TCHRA.[7] The University filed a combined plea to the jurisdiction and summary-judgment motion, arguing that the Labor Code does not waive its sovereign immunity because Niehay presented no evidence to support her claim. The trial court denied the plea and motion. In a per curiam opinion, the court of appeals affirmed.[8] We granted the University's petition for review.

---

[7] *See* TEX. LAB. CODE § 21.051.

[8] 641 S.W.3d 761 (Tex. App.—El Paso 2022).

7

## II

Because the University is a state institution, sovereign immunity protects it from suit or liability unless the Legislature has expressly waived that immunity.[9] The TCHRA waives sovereign immunity, "but only if the plaintiff alleges facts that would establish that the state agency violated the Act and, when challenged with contrary evidence, provides evidence that is at least sufficient to create a genuine fact issue material to that allegation."[10] In determining whether Niehay has met this burden, "we must assume that all evidence supporting [her] allegations is true, and we must resolve all doubts and make all reasonable inferences in [her] favor."[11] "By intertwining the TCHRA's immunity waiver with the merits of a statutory claim, the Legislature ensures public funds are not expended defending claims lacking sufficient evidence to allow reasonable jurors to find the governmental entity liable."[12]

The TCHRA, which is codified in relevant part in Chapter 21 of the Labor Code, makes it unlawful for an employer to discharge an individual because of the individual's disability.[13] A "disability" is

---

[9] *Tex. Tech Univ. Health Scis. Ctr.–El Paso v. Flores*, 612 S.W.3d 299, 305 (Tex. 2020) (citing *Univ. of Tex. Health Sci. Ctr. at Hous. v. Rios*, 542 S.W.3d 530, 532 n.4 (Tex. 2017)).

[10] *Id.* (citing *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 770-771 (Tex. 2018)); *see also Tex. Dep't of Transp. v. Lara*, 625 S.W.3d 46, 52 (Tex. 2021).

[11] *Flores*, 612 S.W.3d at 305; *see also Lara*, 625 S.W.3d at 52.

[12] *Alamo Heights Indep. Sch. Dist.*, 544 S.W.3d at 763.

[13] TEX. LAB. CODE § 21.051(1).

defined as (1) "a mental or physical impairment that substantially limits at least one major life activity of that individual"; (2) "a record of such an impairment"; or (3) "being regarded as having such an impairment."[14] Accordingly, to bring a disability-discrimination claim under the TCHRA, a plaintiff can assert that she actually had an impairment and was discriminated against because of that impairment, or she can allege that her employer "regarded" her as having an impairment—whether or not she did—and discriminated against her because of that perceived impairment.

Niehay asserts only a "regarded as" claim.[15] She must show that she was perceived as having an impairment and was terminated based on that perception.[16] The University argues that Niehay cannot show that she was regarded as having an impairment and that, therefore, she cannot show a disability as defined by the Labor Code. We agree, and accordingly conclude that the University is immune from suit.

**A**

For regarded-as claims, the Labor Code defines "[d]isability" as "a mental or physical *impairment*".[17] Niehay asserts that morbid obesity is

---

[14] *Id.* § 21.002(6).

[15] Niehay initially brought both an "actual" disability claim and a "regarded as" claim. However, she has abandoned the actual disability claim on appeal and proceeds only with her regarded-as claim.

[16] *See id.* § 21.051; *see also id.* § 21.002(12-a) (defining "[r]egarded as having such an impairment").

[17] *Id.* § 21.002(6) (emphasis added). For regarded-as claims, one need not present evidence that the impairment "substantially limits at least one major life activity", as required for actual disability claims. *Id.* § 21.002(12-a).

9

a physical impairment in and of itself and that because the University regarded her as being morbidly obese, she established that the University regarded her as having an impairment. The University argues that morbid obesity, standing alone, is not an impairment. Specifically, the University contends that morbid obesity can qualify as an impairment only if it is caused by or results from an underlying physiological disorder, rather than by lifestyle choices. The University further contends that because Niehay failed to present any evidence that her morbid obesity is the result of a physiological disorder or that the University perceived it as such, she cannot show that the University regarded her as having an impairment. Thus, the ultimate question before us is a legal one: whether morbid obesity qualifies as an impairment under the Labor Code without evidence that it is caused by an underlying physiological disorder or condition.

## 1

To resolve this issue, we look first to the TCHRA itself. The Labor Code does not define impairment. However, "[i]n 1993, the Legislature amended the [TCHRA] to bring it into compliance with . . . the Americans with Disabilities Act. The enactment modified the definition of 'disability' contained in the [T]CHRA to conform it with the ADA definition."[18] In so doing, "the Legislature . . . fully incorporated the ADA definition of the term 'disability' into chapter 21."[19] The definition of "disability" under the ADA then is essentially the same as it is today,

---

[18] *Little v. Tex. Dep't of Crim. Just.*, 148 S.W.3d 374, 377 (Tex. 2004) (internal quotation marks omitted).

[19] *Id.* at 382.

and like the Labor Code, calls for "a physical or mental impairment".[20] Importantly, federal regulations at the time defined "impairment" to mean:

> *Any physiological disorder, or condition*, cosmetic disfigurement, or anatomical loss *affecting one or more of the following body systems*: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine[.][21]

Thus, we can presume that the Legislature was aware of this regulatory interpretation and was accepting of that meaning of "impairment" when it adopted the ADA definition of "disability".[22]

Additionally, one of the TCHRA's express purposes is to "provide for the execution of the policies embodied in Title I of the [ADA] and its subsequent amendments (42 U.S.C. Section 12101 et seq.)".[23] Accordingly, we have previously stated that "our interpretation of the definition of 'disability' contained in chapter 21" is guided by "both the federal court decisions interpreting the ADA and the federal administrative regulations regarding the ADA".[24] The statutory

---

[20] 42 U.S.C. § 12102 (1990).

[21] 29 C.F.R. § 1630.2 (1992) (emphasis added).

[22] *See City of Garland v. Dall. Morning News*, 22 S.W.3d 351, 360 (Tex. 2000) (plurality op.) ("When the Legislature adopts a federal statute, we presume that it knew of the federal court's construction of the federal statute when it adopted the statute and intended to adopt that construction."); *see also Acker v. Tex. Water Comm'n*, 790 S.W.2d 299, 301 (Tex. 1990) ("A statute is presumed to have been enacted by the legislature with complete knowledge of the existing law and with reference to it.").

[23] TEX. LAB. CODE § 21.001(3).

[24] *Little*, 148 S.W.3d at 382.

11

objective of maximizing consistency in federal and state law does not mean that the content of Texas law must yield to any statement made by federal authorities, of course. On the contrary, those authorities sometimes disagree with each other even as to *federal* law, and even when they align, the text of the TCHRA and precedents interpreting it may foreclose federal–state synchronization. But such consistency is desirable, and while federal authorities do not bind us, they frequently assist us in our independent obligation to construe Texas law.

Today, the federal regulatory definition of "impairment" is not much different from its definition in 1993.[25] An "impairment" is

> *Any physiological disorder or condition*, cosmetic disfigurement, or anatomical loss *affecting one or more body systems*, such as neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine[.][26]

The plain language of both the 1993 and the current definitions

---

[25] Congress amended the ADA in 2008 in direct response to a pair of U.S. Supreme Court cases "that too narrowly interpreted when an impairment 'substantially limits a major life activity'". *Morriss v. BNSF Ry. Co.*, 817 F.3d 1104, 1110 (8th Cir. 2016); *see Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999); *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184 (2002). One of the express purposes of the amendments was "to express Congress' expectation that the [EEOC] will revise that portion of its current regulations that defines the term 'substantially limits'". ADA Amendments Act of 2008, Pub. L. 110-325, § 2, 122 Stat. 3553, 3554; *see also* 76 Fed. Reg. 16978, 17004 (March 25, 2011). Notably, Congress expressed no disagreement with the regulatory definition of "impairment" and, in fact, expected that it would remain the same. *See* 76 Fed. Reg. at 17006-17007. The EEOC made only minor changes to the definition in 2011. *See* 29 C.F.R. § 1630.2(h).

[26] 29 C.F.R. § 1630.2(h) (emphasis added).

of impairment requires a physiological disorder or condition to find an impairment. But one's weight, even well outside the normal range, is not a physiological disorder or condition; it is a physical characteristic. "[A] mere physical characteristic does not, without more, equal a physiological disorder."[27] Accordingly, a plaintiff must be able to point to a physiological disorder or condition that causes one's weight to show an impairment.[28] Moreover, the parties appear to agree that obesity, as opposed to morbid obesity, is not an impairment absent evidence of an underlying physiological disorder or condition.[29] It would make little sense to require an underlying physiological disorder or condition for a BMI of 39, but not to require one for a BMI of 40.

Our interpretation of the term impairment is consistent with the federal circuit courts that have addressed this issue. The United States Courts of Appeals for the Sixth, Seventh, and Eighth Circuits have also concluded that the plain language of the EEOC regulation compels the determination that morbid obesity must stem from a physiological disorder or condition to qualify as an impairment for regarded-as claims.[30] The Second Circuit likewise held that a physiological disorder

---

[27] *EEOC v. Watkins Motor Lines, Inc.*, 463 F.3d 436, 442 (6th Cir. 2006) (emphasis omitted) (quoting *Andrews v. Ohio*, 104 F.3d 803, 810 (6th Cir. 1997)).

[28] *See id.* at 443.

[29] *See Francis v. City of Meriden*, 129 F.3d 281, 286 (2d Cir. 1997) (holding, in a regarded-as claim under the ADA, that obesity is not a physical impairment unless it relates to physiological disorder).

[30] *See Watkins Motor Lines*, 463 F.3d at 443 ("[C]onsistent with the EEOC's own definition, we hold that to constitute an ADA impairment, a person's obesity, even morbid obesity, must be the result of a physiological

is required to show an impairment based on the regulatory definition in a case involving obesity (not morbid obesity).[31] These federal decisions are of great use to us in understanding what constitutes a disability-qualifying impairment, especially since Texas jurisprudence includes so few cases that involve morbid obesity.[32]

Niehay points to the fact that the medical community considers obesity to be a medical disorder to argue that morbid obesity is a physiological disorder or condition in and of itself. She also relies on the dictionary definition of "physiology" as "the organic processes and phenomena of an organism or any of its parts or of a particular bodily

condition."); *Richardson v. Chi. Transit Auth.*, 926 F.3d 881, 888 (7th Cir. 2019) ("Without evidence that Richardson's extreme obesity was caused by a physiological disorder or condition, his obesity is not a physical impairment under the plain language of the EEOC regulation."); *Morriss*, 817 F.3d at 1108 (holding, in a case involving morbid obesity, that "[u]nder the plain language of this definition, obesity is not a physical impairment unless it is a physiological disorder or condition and it affects a major body system").

[31] *Francis*, 129 F.3d at 286. In *Francis*, the court noted that "a cause of action may lie against an employer who discriminates against an employee on the basis of the perception that the employee is morbidly obese" and cited a case from the First Circuit. *Id.* In the First Circuit case, however, the plaintiff presented expert testimony that her morbid obesity was the result of a physiological disorder—metabolic dysfunction—and the court ultimately affirmed a judgment in her favor. *See Cook v. R.I., Dep't of Mental Health, Retardation, & Hosps.*, 10 F.3d 17, 23-24 (1st Cir. 1993). Thus, the issue before us was not implicated.

[32] *See* Brief on the Merits for Respondent, at 46 ("Thirty years after the passage of the ADA, and thirteen years after the passage of the ADA Amendments Act, which greatly expanded the protections of the ADA and Chapter 21, the instant case is only the third reported morbid-obesity case in the state courts of Texas.").

process".[33] Specifically, she argues that morbid obesity—which she describes as the excessive accumulation of fat cells—is an organic process and phenomenon of an organism and therefore qualifies as a physiological disorder or condition. She also argues that it affects several of her body systems, including her musculoskeletal, respiratory, and cardiovascular systems. Therefore, she claims, morbid obesity is a physiological disorder or condition that affects multiple body systems, meeting the definition of impairment. The court of appeals rested its holding on this interpretation of the regulatory text as well.[34]

Our task is one of statutory interpretation. Whether obesity is considered a disorder in the medical community says little of whether morbid obesity qualifies as an impairment under the Labor Code.[35] Moreover, Niehay's interpretation is untenable. The dictionary-definition reading that Niehay advances would mean that even normal bodily functions could be considered a disability. A person who lifts weights regularly accumulates muscle mass, which is a normal bodily response and process. But the accumulation of muscle mass is also an "organic process[] and phenomen[on] of an organism", and it affects a

[33] *Physiology*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/physiology (last visited June 24, 2023).

[34] 641 S.W.3d at 780.

[35] *See Richardson*, 926 F.3d at 891 ("This argument [that the medical community considers obesity to be a disease] is not persuasive. The ADA is an antidiscrimination—not a public health—statute, and Congress's desires as it relates to the ADA do not necessarily align with those of the medical community."); *cf. Tex. Bd. of Chiropractic Exam'rs v. Tex. Med. Ass'n*, 616 S.W.3d 558, 570-571 (Tex. 2021) (determining whether an agency rule contravenes a statute involves legal analysis of the statutory text and purpose, not weighing evidence from the healthcare community).

body system, namely, the musculoskeletal system.[36]

Reading the regulation as a whole and in context shows that a "physiological disorder or condition" means an *abnormal* bodily function or state.[37] It is listed alongside "cosmetic disfigurement" and "anatomical loss".[38] Indeed, the dictionary definition of "disorder" is "an *abnormal* physical or mental condition",[39] and "condition" is defined as, among other things, "a usually *defective* state of health".[40] But the accumulation of fat cells is a normal bodily process, so asserting that one is overweight is insufficient by itself to show a physiological disorder or condition. A person's morbid obesity could be her body's normal and natural response to the person's lifestyle choices or eating habits. To show a physiological disorder or condition, Niehay would need to show that her body's process of accumulating fat cells is somehow abnormal. In other words, to show an impairment, Niehay would need to show that her morbid obesity is due to a physiological disease or condition.

The dissent would apply the dictionary definition of "impairment" as a "diminishment, deterioration, or loss of function or ability" to hold

---

[36] *Physiology*, *supra* note 33.

[37] *See Tex. Bd. of Chiropractic Exam'rs*, 616 S.W.3d at 569 (noting that "context is fundamental to understanding the use of language" and one should not draw meaning "from isolated words or phrases" (quotation omitted)).

[38] 29 C.F.R. § 1630.2(h).

[39] *Disorder*, Merriam-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/disorder (last visited June 24, 2023) (emphasis added).

[40] *Condition*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/condition (last visited June 24, 2023) (emphasis added).

that morbid obesity qualifies as such.[41] But we apply the common meaning of the words of a statute "unless a different meaning is apparent from the context or the plain meaning leads to absurd or nonsensical results."[42] Here, the words arise within the context of a statutory scheme prohibiting disability discrimination in employment, our understanding of which is guided by extensive rules and regulations under Texas and federal law, including one that defines the very term we seek to interpret and that the Legislature has impliedly accepted.

**2**

In addition to the regulatory definition of "impairment", EEOC Interpretive Guidance on Title I of the ADA also supports that morbid obesity is not an impairment without an underlying physiological disorder or condition. It states:

> The definition of the term "impairment" does not include physical characteristics such as eye color, hair color, left-handedness, or height, weight, or muscle tone that are within "normal" range and are not the result of a physiological disorder. The definition, likewise, does not include characteristic predisposition to illness or disease. Other conditions, such as pregnancy, that are not the result of a physiological disorder are also not impairments.[43]

Niehay reads this to mean that for weight to be an impairment "it must either be outside normal range or the result of a physiological disorder." But "a more natural reading of the interpretive guidance" is

---

[41] *Post* at 5-7 (Boyd, J., dissenting).

[42] *KMS Retail Rowlett, LP v. City of Rowlett*, 593 S.W.3d 175, 183 (Tex. 2019) (internal quotation marks omitted).

[43] 29 C.F.R. Pt. 1630, App. at § 1630.2(h).

that weight is an impairment "only if it falls outside the normal range *and* it occurs as the result of a physiological disorder. Both requirements must be satisfied".[44] When changing the sentence to be a statement in the affirmative, its meaning becomes quite clear: the definition of the term "impairment" includes physical characteristics such as weight that are not within "normal" range and are the result of a physiological disorder. This interpretation is further supported by the statement in the interpretive guidance that "[o]ther conditions, such as pregnancy, that are not the result of a physiological disorder are also not impairments."[45] In other words, conditions and physical characteristics must be the result of a physiological disorder to be considered an impairment.[46]

Were Niehay's reading to be adopted, it would mean that "any employee whose weight—or other physical characteristic—is even slightly outside the 'normal range' would have a physical impairment even with no underlying physiological cause."[47] That would be "inconsistent with the [TCHRA]'s text and purpose" and would transform the regarded-as claim into "a catch-all cause of action for discrimination based on appearance, size, and any number of other things far removed from the reasons the [TCHRA] was passed."[48]

---

[44] *Morriss*, 817 F.3d at 1108; *see also Richardson*, 926 F.3d at 890.

[45] 29 C.F.R. Pt. 1630, App. at § 1630.2(h).

[46] *Morriss*, 817 F.3d at 1108-1109.

[47] *Richardson*, 926 F.3d at 890.

[48] *Id.* (quoting *Watkins Motor Lines*, 463 F.3d at 443) (alteration omitted); *see also Watkins Motor Lines*, 463 F.3d at 443 ("We decline to extend

The question whether morbid obesity qualifies as an impairment without evidence of an underlying physiological disorder or condition has split lower courts.[49] However, based on the foregoing analysis and considering uniform federal circuit court precedent, particularly in light of the TCHRA's express purpose to "provide for the execution of the policies" of the ADA,[50] we conclude that morbid obesity does not qualify as an impairment under the Labor Code absent an underlying physiological disorder or condition.

**B**

Given our conclusion that morbid obesity qualifies as an

---

ADA protection to all 'abnormal' (whatever that term may mean) physical characteristics.").

In litigation before the Ninth Circuit, the EEOC as amicus curiae took the position that weight "may be an impairment when it is either outside the 'normal' range *or* occurs as the result of a physiological disorder", consistent with Niehay's argument before us. *Taylor v. Burlington N. R.R. Holdings Inc.*, 904 F.3d 846, 851 (9th Cir. 2018) (emphasis added). However, this interpretation is inconsistent with the regulatory definition and the interpretive guidance, and we do not consider it persuasive. *Cf. Morriss*, 817 F.3d at 1111 n.4 (8th Cir. 2016) ("The [EEOC] has not modified its regulations or interpretive guidance construing [physical impairment], . . . and its contradictory position in this litigation thus is not entitled to deference.").

[49] *See Richardson*, 926 F.3d at 887 (listing cases). The Montana Supreme Court has also addressed this issue as it relates to the Montana Human Rights Act, which is analogous to the ADA. It concluded that obesity qualifies as an impairment without a showing of an underlying physiological disorder or condition. *See BNSF Ry. Co. v. Feit*, 281 P.3d 225, 226 (Mont. 2012). At the time of Montana's holding, only the Second and Sixth Circuits had addressed the issue. Since then, the Seventh and Eighth Circuits have also held that morbid obesity must be caused by an underlying physiological disorder or condition to qualify as an impairment, resulting in a greater consensus among federal circuit courts.

[50] TEX. LAB. CODE § 21.001(3).

impairment under the Labor Code only when caused by a physiological disorder or condition, for a claim that a plaintiff was "regarded as" having an impairment due to her morbid obesity, one would need to present evidence that her morbid obesity was caused by an underlying physiological disorder or condition or that her employer regarded her morbid obesity as being caused by an underlying physiological disorder or condition. Niehay has presented evidence of neither, so her claim necessarily fails.

Niehay herself does not contend that there is evidence her morbid obesity resulted from a physiological disorder or that that was the University's perception. She testified in her deposition, "we don't actually know the specific causes for each individual's obesity. It's a big area of research. And so lifestyle factors, medical factors can all contribute." If Niehay, a physician, does not herself regard her morbid obesity as being caused by a physiological disorder, it seems implausible to think any of the other physicians with whom she worked did. Unsurprisingly, there is no evidence their perceptions differed from hers.

To be sure, there is evidence that some of Niehay's problems with her work performance were perceived to be related to her weight and health. One physician reported that Niehay really struggled during a procedure they performed together and that she was sweating profusely, had difficulty breathing, and had to take multiple breaks because of her inability to stand and bend over to access the patient. She blamed Niehay's struggles on her "habitus," meaning her physical size, structure, or state. Other physicians noted her sweating during

procedures as well. One physician reported that she overheated and became physically ill after a procedure. One physician told another that Niehay's issues were largely due to her health state. Another wondered if Niehay's problems were health related. Another wished Niehay success in dealing with her health issues.

This is all evidence that Niehay's work issues were due to her size and accompanying health issues—sweating, breathing difficulties, and stamina. But none of that is evidence of Niehay's regarded-as claim. The missing piece is any evidence or inference that Niehay's coworkers regarded her obesity as being *caused by* health issues—a physiological disorder not apparent to an observer—rather than *causing* health issues, which was obvious. In short, Niehay has not made the requisite evidentiary showing.

In sum, for a claim of disability discrimination under the TCHRA based on an allegation that the employer regarded an individual as morbidly obese, morbid obesity is not an impairment under the Labor Code absent evidence that it results from a physiological disorder or condition. There is no evidence or inference that Niehay's morbid obesity was caused by a physiological disorder, and Niehay makes no argument to the contrary. Thus, she cannot establish that Texas Tech regarded her as having an impairment, and she has not shown a disability as defined in the Labor Code. Her claim must be dismissed for want of jurisdiction.[51] Because we hold that Niehay cannot show that the

---

[51] Niehay asserts that if we were to reverse the court of appeals' judgment, we should remand for consideration of whether the trial court abused its discretion in excluding Niehay's physician's statement from

University regarded her as having an impairment, we need not address whether Texas Tech dismissed her "because of" the perceived impairment and the accompanying evidentiary issue regarding the disclosure of attorney–client privileged communications.

*     *     *     *     *

We reverse the judgment of the court of appeals and dismiss the case for lack of jurisdiction.

_____
Nathan L. Hecht
Chief Justice

**OPINION DELIVERED:** June 30, 2023

---

evidence. However, remand is unnecessary because even assuming *arguendo* that the trial court abused its discretion, the physician's statement does not say that Niehay's morbid obesity is caused by a physiological disorder or condition. It simply says that she has been diagnosed with morbid obesity and other health issues and that her morbid obesity affects various of her body systems. In other words, admission of the physician's statement would not preclude dismissal.