In the

# United States Court of Appeals

## For the Seventh Circuit

_____

Nos. 20-3048, 21-1110

RENEE LANGE,

*Plaintiff-Appellant,*

*v.*

CITY OF OCONTO and CITY OF OCONTO FALLS,

*Defendants-Appellees.*

_____

Appeals from the United States District Court for the
Eastern District of Wisconsin.
No. 18-cv-00821 — **William C. Griesbach**, *Judge.*

_____

ARGUED SEPTEMBER 17, 2021 — DECIDED MARCH 16, 2022

_____

Before SYKES, *Chief Judge,* and FLAUM, and KIRSCH, *Circuit Judges.*

FLAUM, *Circuit Judge.* Plaintiff-appellant Renee Lange, who is deaf and communicates in American Sign Language ("ASL"), filed suit against defendants-appellees the City of Oconto and the City of Oconto Falls ("the Cities"). She alleged that the Cities violated Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131, *et seq.*, and § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, when their police

officers did not provide a qualified ASL interpreter for her during four interactions in 2016 and 2017. The case proceeded to trial, and the jury returned a verdict for the Cities. The district court then awarded costs to the Cities.

Lange now appeals, asserting that various errors require reversal of the district court's judgment or, at the least, reversal of the decision to impose costs on her. We conclude, however, that Lange was not prejudiced by the district court's jury instructions, and the district court did not abuse its discretion in awarding a reduced amount of costs to the Cities despite Lange's apparent indigency. Therefore, we affirm both the judgment of the district court, as well as the decision to impose costs on Lange.

## I.    Background

Lange was born deaf. She primarily communicates through ASL,[1] with some ability to verbalize and read lips. She has two children, R. and B., who were minors at the time of the events that form the basis of this case. Her daughter, R., was seventeen, and her son, B., was fourteen. These children are not deaf, and Lange communicates with them using ASL.

---

[1] "American Sign Language … is a complete, complex language that employs signs made by moving the hands combined with facial expressions and postures of the body." *Noll v. Int'l Bus. Machines Corp.*, 787 F.3d 89, 99 n.1 (2d Cir. 2015) (Sack, J., dissenting) (alteration in original) (quoting Nat'l Inst. on Deafness and Other Commc'n Disorders, U.S. Dep't of Health & Human Servs., *NIDCD Fact Sheet: American Sign Language*, http://www.nidcd.nih.gov/health/hearing/pages/asl.aspx). ASL "is a language completely separate and distinct from English," with "its own rules for pronunciation, word order, and complex grammar." *Id.* (quoting *NIDCD Fact Sheet*).

Lange brought this lawsuit asserting that the Cities discriminated against her in violation of the ADA and the Rehabilitation Act during interactions between Lange and the Cities' police departments. The case survived summary judgment and proceeded to trial regarding four episodes (the "incidents"), which occurred from May 30, 2016, to February 3, 2017. One of the incidents at issue occurred in Oconto; the other three occurred in Oconto Falls. In each of these incidents, the police did not provide Lange with an ASL interpreter but instead relied on one of Lange's minor children for interpretive services in some capacity. Lange alleged that during each incident she requested an interpreter or, alternatively, the need for an interpreter was obvious. Because the Cities did not provide an interpreter, Lange contended, she could not effectively communicate with the officers involved.

The jury returned a verdict in favor of the Cities. The following facts reflect the witness testimony and documentary evidence introduced at trial.

### A. Factual Background

*1. The May 30, 2016 Incident*

The first incident took place on the evening of May 30, 2016, in Oconto. Oconto Police Officers Glenn Sowle and Erek Belongia arrived at Lange's residence in response to a noise complaint. Officer Sowle and Lange offered competing versions of what transpired.

According to Officer Sowle, upon arriving, the officers could hear banging on a door inside the home. Lange's daughter, R., then came outside and said that Lange's friends, who are also deaf, had caused the noise. Lange came out after a few minutes, yelling and screaming. R. tried signing to

Lange that R. did not call the police, and Officer Sowle at-tempted to tell Lange verbally that the officers had responded to a noise complaint from a neighbor. Lange herself testified that she was upset and yelled at R. to "[s]hut up" and "[s]top it." Officer Sowle testified that he wrote on his notepad asking Lange to "please be quiet" and showed that message to her "a number of times"—although Lange testified that he only showed it once—but she still would not keep quiet. Officer Sowle testified that he could smell a strong odor of intoxicants coming from Lange, so he wrote on his notepad, "How much have you had?" Lange did not answer. Officer Sowle stated that after everybody calmed down, he told them verbally that if the officers had to come back, they would arrest somebody. According to Officer Sowle, all parties "agreed to call it a night."

About fifteen minutes later, the officers received another call about a disturbance at Lange's residence. Officer Sowle testified that, when he returned, he could hear "yelling and screaming coming from inside the house." R. came outside and said that Lange had locked them out of the house. Lange's next-door neighbors, Doug and Cheryl Wusterbarth, also came outside and were upset. They told Officer Sowle that Lange had been fighting with and hitting her children in the street, and they complained about "drugs going in and out of the house."

Officer Sowle testified that Lange came outside and started yelling and screaming again. He verbally requested that she please be quiet, but she did not comply. He stated that he again showed her his notebook with the "please be quiet" message. Lange still did not comply. Other neighbors came out, and they also said that Lange had fought with her

children in the street. At that time, Officer Sowle had R. sign to Lange that he was placing her under arrest for disorderly conduct. Lange signed back asking, "Why are we being placed under arrest?" R. showed Officer Sowle the sign for arrest by clicking the wrists together, and he mimicked that sign. Officer Sowle testified that he placed Lange's handcuffs on in the front in response to a comment from R. about protecting Lange's ability to communicate with her hands.

As Officer Sowle walked Lange to the squad car after placing her in handcuffs, R. told him that Lange was requesting an interpreter. He said that he called dispatch to report the request. According to Officer Sowle, as they drove to the jail, Lange was yelling, screaming, and jumping around in the back of the car. At the jail, she demanded to know why she was being arrested. Officer Sowle told her it was for disorderly conduct, and Lange became upset again. The parties do not dispute that Lange never received an interpreter at the jail.

At trial, Officer Sowle testified that he believed that Lange "fully understood what was going on." He stated that he had at least four or five previous contacts with Lange, and during those contacts, he had primarily communicated with Lange using a pen and paper, as well as speaking verbally. He contended that Lange had a strong ability to read and write, as well as lip read, and they could effectively communicate through these methods. Officer Sowle further testified that—other than during the May 30, 2016 incident—Lange never requested an ASL interpreter during any of her contacts with him. Finally, Officer Sowle stated that Lange was easily agitated, and communication became difficult if not impossible when she was agitated. He added that he was concerned for

the safety of Lange's children on the night of her arrest, and that concern factored into his decision to arrest Lange.

Lange, however, testified that she had great difficulty understanding the May 30, 2016 interaction with the police. She said that she did not know if R. interpreted Lange's questions to the police or the fact that she wanted an interpreter. Lange said that she attempted to request an interpreter through R. as well as through verbal communication, body language, and a written note. She said that if she had received an interpreter, she "would have been less upset because I would have understood what was going on."

Several other witnesses testified regarding the May 30, 2016 incident, as well as other interactions Lange had with the Oconto Police Department.

Lange's next-door neighbor at the time, Doug Wusterbarth, confirmed that he witnessed Lange and R. fighting in the street and called the police. He testified that he observed the police attempting to talk to Lange after they arrived. He saw Lange and R. signing back and forth and watched an officer offer Lange a pad of paper. Nonetheless, the yelling continued. Wusterbarth said that the police asked Lange to be quiet and go back in her house, but Lange did not comply or quiet down. He stated that the officer had a notepad in his hand "pretty much the whole time" and offered it to Lange "[a]t least a couple times." Wusterbarth testified that Lange appeared intoxicated, and he never heard her request an interpreter (although he acknowledged the possibility he simply did not hear such a request).

Retired Oconto Police Chief Bernard Faith testified that Lange voluntarily came to the Oconto Police Department two

days after the incident, on June 1, 2016. With her son, B., interpreting, Lange requested a complaint and witness forms regarding her arrest on May 30; she later returned the completed complaint. Both Chief Faith and current Oconto Police Chief Michael Rehberg testified generally that they had other contacts with Lange, and in their experience, she never requested an ASL interpreter. Chief Faith would write notes to her, and she would frequently use her children to translate back to him. Chief Rehberg would let Lange dictate the method of communication; if she wanted to write on paper or use her children to interpret, he would follow her choice. According to Chief Rehberg, R. said that Lange could read lips, but the speaker needed to face Lange and speak clearly and slowly for her to do so. Finally, Rehberg acknowledged that it would be inappropriate to rely on Lange's minor children to interpret under the department's current policy, which it adopted after the incidents.

Rounding out the witnesses from the Oconto Police Department, Detective Nicole Crocker also testified—over Lange's objection. Detective Crocker was not present at the May 30, 2016 incident, but nonetheless had over a dozen contacts with Lange. In Crocker's experience, Lange never requested an ASL interpreter; instead, she estimated, Lange relied on one of her children to interpret about 75% of the time and used a pen and paper the rest of the time. Detective Crocker would follow Lange's decision to initiate communication through her children or using notes. Detective Crocker believed Lange was adept at lip reading based on what B. had told her, as well as her experience with Lange. Lange could also speak well enough for Detective Crocker to fully understand her. Lange's demeanor when agitated, however, made it impossible to effectively communicate. Finally, Detective

Crocker testified that, based on her review of records from the Oconto County Sheriff's Department, Lange had around 115 total contacts with Oconto County agencies, including both the Oconto and Oconto Falls police departments.

   2. *The November 13, 2016 Incident*

The remaining incidents took place in Oconto Falls, with the second occurring on the evening of November 13, 2016. Lange's son, B., called his uncle regarding a fight involving a knife and told his uncle that he feared for his life. B. testified that he contacted his uncle because he felt he was in immediate danger from Lange's boyfriend, Jeremy Parmer—who is also deaf. B. stated he did not want to directly call 911 himself for fear of escalating the situation. B.'s uncle called 911, and Oconto County Sheriff's deputies and Oconto Falls Police Officer Corey Rank responded to Lange's home. Upon arrival, Officer Rank observed Lange and Parmer facing each other and thrusting their arms toward one another. The deputies and Officer Rank detained Parmer and then arrested him.

Officer Rank testified that he then began trying to communicate with B., the complainant, to figure out what had happened, but Lange kept interrupting his conversation to try to communicate with B. herself. According to Officer Rank, Lange was loud and agitated. Officer Rank knew Lange was deaf and that she communicated by ASL.

Lange later testified that she was upset because she did not want Officer Rank to use B. as her interpreter. She asserted that she told B. not to interpret. Officer Rank, on the other hand, believed Lange was trying to obstruct his conversation with B. He stated that he attempted to communicate with Lange, but she ignored him. He also asked B. if he could try

to get Lange to calm down, and B. said that Lange would not. Lange later testified that she had been drinking and was "buzzed" at the time.

Officer Rank testified that he never requested an ASL interpreter during the incident; however, Lange also never requested an interpreter. Lange herself did not clearly dispute this point, but B. testified that she did request one. Officer Rank stated that he was not sure if he "would have brought an interpreter into that situation" because "[i]t was … very volatile and … not a good situation" in which to introduce additional people. Instead, he tried "to control the situation and reduce the emergency." Officer Rank agreed, however, that having an interpreter available might have led to a better outcome.

### 3. *The February 2, 2017 Incident*

The third incident occurred on February 2, 2017. Oconto Falls Police Officer Jamie Kuhn responded to a complaint by Laurie King, a former friend of Lange who is also deaf. King alleged that Lange's boyfriend Parmer had assaulted her. After speaking with King, Officer Kuhn proceeded to Lange's apartment to arrest Parmer. Officer Kuhn testified that she knew Lange and Parmer were deaf, but she did not request an interpreter because Lange "always used her children as their interpreters."

Upon arriving, B. met Officer Kuhn at the bottom of the stairs to the apartment. Lange was also present, and when Officer Kuhn asked B. if she could come in, Lange answered verbally, "yes." Officer Kuhn testified that she then used B. as an interpreter during her time at Lange's apartment. Officer Kuhn, with B. signing, asked Parmer about whether he

owned a hat that King described her assaulter as wearing. Parmer denied owning the hat, and Lange verbally said something like "He doesn't have that."

Officer Kuhn testified that both Lange and Parmer were agitated during the encounter, and when she told Parmer that she was placing him under arrest, both Lange and Parmer got up and started "screaming, yelling," and "throwing their arms around." Parmer told Officer Kuhn that he was going to "shoot the bitch [King]," (although Lange testified that he said "sue," not "shoot") and Lange threatened the officer, saying, "I'm coming after you." Officer Kuhn then told B. that if Lange did not stop, Officer Kuhn would arrest her too, whereupon Lange backed up a few feet and quieted down.

Officer Kuhn testified that Lange never requested an ASL interpreter. She also stated that she did not know of any instance in which Lange had requested an ASL interpreter and had never seen Lange communicating with an interpreter. Instead, Officer Kuhn testified that she believed Lange could communicate adeptly through lip reading and by pen and paper, and she had effectively communicated with Lange through those methods in the past. Officer Kuhn explained that she felt it was impossible to communicate with Lange when Lange was screaming and yelling.

When asked why she did not request an interpreter, Officer Kuhn testified that it was not safe to bring an interpreter into that "escalating" situation. Officer Kuhn added that she did not attempt to call a virtual interpreter on her smartphone because she did not want "to unnecessarily put anything in my hands at that moment." She specifically testified that she believed holding a phone in her hand when dealing with

volatile individuals is "not safe for [other people] and it's not safe for me."

*4. The February 3, 2017 Incident*

The fourth incident at issue took place the following day, February 3, 2017. That morning, Lange came with B. on her own initiative to the Oconto Falls Police Department. Oconto Falls Police Chief Brad Olsen testified that Lange brought her cell phone to show him a purported harassing message from King to Lange. Lange used B. to interpret during this encounter.

Lange showed the message, sent over the Facebook Messenger application, to Chief Olsen. The message essentially stated that King had lied to the police the previous evening about being assaulted by Parmer and that she was sorry Parmer was arrested. Chief Olsen took a photo of the message with his department phone.

Chief Olsen testified that after Lange departed, the police brought in King for an interview. During that interview, Chief Olsen and Officer Keith Fischer concluded that King did not send the message or create the profile that sent it. Chief Olsen then obtained a search warrant for Lange's electronic devices and the distinctive hat that King had reported Parmer was wearing during the alleged assault. Chief Olsen and Officer Fischer executed the warrant at Lange's residence that afternoon. Although they knew Lange was deaf, they did not attempt to secure an interpreter before going to her home.

The officers saw B. when they arrived at Lange's apartment and explained why they were there; B. then invited them in. When they got inside, B. began signing to Lange.

Neither Chief Olsen nor Officer Fischer asked B. to interpret, and Lange did not object to B. interpreting.

Both Chief Olsen and Officer Fischer testified that when Lange received a written copy of the search warrant, she became agitated, loud, argumentative, and generally uncooperative. Officer Fischer explained that the police informed B. that they were looking for a particular hat and electronic devices, and he believed B. and Lange clearly understood because they responded appropriately, saying—through both B. interpreting and Lange speaking verbally—that they did not "have that hat anymore" and that "nothing like [those electronic devices] would be here." Thus, Officer Fischer at no point felt the officers were not effectively communicating with Lange. In contrast, Lange testified that she was confused about the warrant's contents and why the police were searching her home.

Officer Fischer further testified that he had many contacts with Lange, and he believed that she could adeptly communicate through writing. He said that he could not remember any contact where he wrote something and Lange did not understand it. Additionally, he testified that Lange never asked for an interpreter.

Chief Olsen and Officer Fischer testified that Lange initiated several in-person and written contacts with the police in the ensuing weeks, including multiple trips and calls to the department about Parmer. Chief Olsen said that she sometimes brought B. to interpret and other times used written notes, but she never requested an interpreter. Officer Fischer testified that Lange wrote letters to the police department complaining about the incidents. The district court admitted two of those letters into evidence.

Finally, Chief Olsen testified that the police would obtain any required interpreter through the Oconto County Sheriff's Department dispatch. He explained his understanding that the ASL interpreters that dispatch would call are about thirty-five minutes to an hour away.

### B. Procedural History

After presenting her case, Lange moved for judgment as a matter of law. She argued that the evidence permitted only one reasonable conclusion—that the Cities denied Lange effective communication at each of the four incidents by not providing an ASL interpreter and by using a minor child to interpret. The district court took the motion under advisement until the jury rendered a verdict.

At the close of evidence, the court instructed the jury on the elements of Lange's claim, explaining:

> In order to prevail on her discrimination claim … Plaintiff must prove by a preponderance of the evidence that
>
> 1. Plaintiff requested an interpreter or the need for an interpreter was known or obvious;
>
> 2. The Defendant unreasonably failed to give primary consideration to her request for an interpreter;
>
> 3. As a result, Plaintiff was unable to effectively communicate with the officers; and
>
> 4. In failing to provide an interpreter, the Defendant intentionally discriminated against Plaintiff based on her disability. Intentional

discrimination does not require personal animosity or ill will.

The district court also instructed the jury on certain regulations, discussed further below, that elaborate on a public entity's obligation to ensure effective communication. Relevant to this appeal, the court informed the jury that police officers generally should not rely on a minor child to interpret, except in emergencies. It went on to state: "Police need not interfere, however, in the decision of a private citizen to use his or her own child to facilitate her communication." Lange objected to this instruction, arguing that it had no basis in the regulation and misstated the law. The district court overruled her objection, reasoning that it "d[id not] think that the police should be preventing a deaf person from communicating with them in the manner they choose" and that this instruction was "consistent with the requirement of reasonableness."

After deliberating for approximately two hours, the jury returned a verdict in favor of the Cities on each of Lange's four claims. The district court denied Lange's motion for judgment as a matter of law, concluding that the evidence was sufficient for the jury to find in favor of the defendants on each count.

Following the verdict, the clerk of the court taxed costs to Lange in the amount of $4,012.97. Lange then filed a motion for the district court to review the decision to tax costs. She requested that the district court deny the Cities' bill of costs because she is indigent. The Cities and the district court recognized Lange's indigency; nonetheless, the district court still taxed Lange a reduced amount of $1,000 in costs.

After the entry of the district court's final judgment awarding costs to the Cities, Lange appealed to this Court.

## II.    Discussion

On appeal, Lange seeks a determination that the district court made prejudicial errors instructing the jury and admitting evidence, warranting a new trial or flat-out reversal of the trial court's decision denying her motion for judgment as a matter of law. In the alternative, she seeks reversal of the district court's award of costs.

Lange argues that the district court erred in four ways. First, she asserts that the district court misstated the law when it instructed the jury that "[p]olice need not interfere, however, in the decision of a private citizen to use his or her own child to facilitate her communication." Second, and relatedly, she contends that the district court erred when it denied her motion for judgment as a matter of law because the Cities' witnesses admitted to using her minor children in nonemergency situations. Third, she asserts that the court wrongly allowed Detective Crocker, a nonparty to the four incidents at issue, to testify to Lange's approximately 115 unrelated contacts with both police departments in violation of Federal Rules of Evidence 403 and 404. Fourth, Lange argues that the district court erroneously taxed costs of $1,000 to her. We address each argument in turn.

### A.  Jury Instruction Regarding the Use of Minors as Interpreters

We review first the challenged jury instruction and whether it was prejudicial so as to warrant a new trial. The district court instructed the jury as follows:

> Police officers should not rely on a minor child to interpret or facilitate communication, except in an emergency situation involving an imminent threat to the safety or welfare of an individual or the public where there is no other interpreter readily available. Police need not interfere, however, in the decision of a private citizen to use his or her own child to facilitate her communication.

According to Lange, the final sentence of this instruction misstated the law. Lange timely objected to the instruction under Federal Rule of Civil Procedure 51. *See Pittman ex rel. Hamilton v. County of Madison*, 970 F.3d 823, 826 n.1 (7th Cir. 2020). She now asserts that this error demands a new trial.

We review de novo whether a challenged jury instruction misstated the law. *Id.* at 827. Even if an instruction is legally deficient, we will reverse a district court and grant a new trial "only if the instruction misstates the law in a way that misguides the jury to the extent that the complaining party suffered prejudice." *Sanchez v. City of Chicago*, 880 F.3d 349, 355–56 (7th Cir. 2018) (internal quotation marks omitted) (quoting *Viramontes v. City of Chicago*, 840 F.3d 423, 428 (7th Cir. 2016)).

### 1. *Whether the Instruction Correctly Stated the Law*

Lange brought her claims under Title II of the ADA and Section 504 of the Rehabilitation Act, which both prohibit discrimination against qualified persons with disabilities. *See* 42 U.S.C. § 12132; 29 U.S.C. § 794(a). Specifically, these laws seek to ensure that qualified individuals are not "excluded from participation in or … denied the benefits of the services, programs, or activities of a public entity, or … subjected to

discrimination by any such entity." *See* 42 U.S.C. § 12132; *see also* 29 U.S.C. § 794(a) ("No … qualified individual with a disability … shall, solely by reason of … disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance …."). For purposes of this appeal, these two laws are "functionally identical." *See Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015).[2]

Title II itself does not address the use of minor children as interpreters for individuals who are deaf or hard of hearing. Instead, the Attorney General, "at the instruction of Congress," *Wis. Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 751 (7th Cir. 2006) (en banc), has issued implementing regulations concerning when covered entities may rely on friends or family members accompanying individuals with disabilities to aid in providing effective communication, *see* 28 C.F.R. § 35.160.[3]

---

[2] For clarity, therefore, we generally refer only to the ADA throughout the opinion. Unless otherwise stated, the analysis applies to both the ADA and the Rehabilitation Act.

[3] The parties and the district court proceeded as though the DOJ's regulations were binding interpretations of the applicable law. Nonetheless, "[w]e have noted that the Supreme Court never has decided whether the Attorney General's regulations here are entitled to [the degree of] deference" described in *Chevron, U.S.A. Inc. v. National Resource Defense Council, Inc.*, 467 U.S. 837, 844 (1984). *Ashby v. Warrick Cnty. Sch. Corp.*, 908 F.3d 225, 231 n.12 (7th Cir. 2018). At a minimum, though, the Supreme Court has said that the "well-reasoned views" of the DOJ, as the agency charged with implementing Title II, "warrant respect" and "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 597–98 (1999) (internal quotation marks omitted). Accordingly, as the

The relevant regulation, codified at 28 C.F.R. § 35.160, first mandates that public entities "shall furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities … an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity." *Id.* § 35.160(b)(1). Subsection (b) then acknowledges that "[t]he type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place." *Id.* § 35.160(b)(2). Where an interpreter—as opposed to a different auxiliary aid—is necessary to "ensure effective communication," subsection (c) further provides that, in general, "[a] public entity shall not rely on an [accompanying] adult [or] … a minor child to interpret or facilitate communication …." *Id.* § 35.160(c).

Nonetheless, there are exceptions to the general prohibition against using accompanying persons as interpreters, which differ depending on whether the accompanying person is an adult or minor child. If the accompanying person is an adult, then a public entity may enlist his or her help in two circumstances: (1) "[i]n an emergency involving an imminent threat to the safety or welfare of an individual or the public where there is no interpreter available," or (2) when both the disabled individual and accompanying person consent and "reliance on that adult for [communication] assistance is appropriate under the circumstances." *Id.* § 35.160(c)(2). If the

---

parties do, we assume that the regulations applied in this case. *See Kikalos v. Comm'r Internal Revenue*, 190 F.3d 791, 796 (1999) ("The parties have assumed that full *Chevron* deference is in order and so shall we.").

accompanying person is a child, however, only the exigent circumstances exception applies; there is no consent-based exception. *Id.* § 35.160(c)(3).

On Lange's view, the district court created a second, impermissible exception to the DOJ's regulation prohibiting the use of minor children as interpreters when it instructed the jury that the police could rely on "the decision of a private citizen to use his or her own child to facilitate her communication." During the jury instruction conference, the district court reasoned that its instruction did not misstate the law because Lange, not the police officers, "relied" on her children to interpret. Lange argues that that distinction employs an exceedingly narrow view of the implementing regulation and elides the practical reality that if a minor child serves as an interpreter, both parties—on either side of the interpretation—must rely on that child to facilitate communication. Similarly, Lange contends, whether the officers employed methods of communication in addition to using her children as interpreters should have no bearing on the analysis.

Lange bolsters this argument by pointing to additional guidance published by the DOJ. In its response to public comments on its 2010 rulemaking amending 28 C.F.R. § 35.160(c)(3), the DOJ explained that it adopted a prohibition on the use of minor children as interpreters both to avoid involving minor children in adult situations (like those concerning medical issues or domestic violence) and to avoid placing minor children in an inappropriate position vis-à-vis their adult relatives. *See* Nondiscrimination on the Basis of Disability in State and Local Government Services, 75 Fed. Reg. 56,164, 56,224–25 (2010). Guidance published by the DOJ in 2014 elaborates that it has been "particularly problematic [for

covered entities] to use people's children as interpreters,"
even beyond a general concern that accompanying family
members or friends may "lack[] the impartiality and special-
ized vocabulary needed to interpret effectively and accu-
rately." U.S. Dep't of Just., C.R. Div., Disability Rts. Section,
*ADA Requirements: Effective Communication* 5 (2014),
https://www.ada.gov/effective-comm.pdf.          Furthermore,
while the DOJ's 2014 guidance reiterates that a covered entity
may use an accompanying adult where the relevant parties
consent and it is "appropriate under the circumstances," it ex-
plicitly emphasizes that "[t]his exception does *not* apply to
minor children." *Id.*

The Cities respond with a textual argument in support of
the district court's instruction. They point to language in sub-
section (b) of the regulation, which states that, "[i]n determin-
ing what types of auxiliary aids and services are necessary, a
public entity shall give primary consideration to the requests
of individuals with disabilities." 28 C.F.R. § 35.160(b)(2). On
the Cities' view, the district court's instruction that "[p]olice
need not interfere" with Lange's use of her children appropri-
ately harmonized section (b)'s directive to give primary con-
sideration to disabled individuals' preferred auxiliary aids,
with section (c)'s general prohibition on the use of accompa-
nying individuals.[4]

---

[4] The Cities also point to out-of-circuit caselaw as support for their
argument. *See Tucker v. Tennessee*, 539 F.3d 526 (6th Cir. 2008), *abrogated in
part on other grounds as recognized by Anderson v. City of Blue Ash*, 798 F.3d
338, 357 n.1 (6th Cir. 2015). However, *Tucker* is not persuasive, as that case
involved an adult plaintiff and whether she consented to interpret for her
adult son; it did not concern minor children and whether their adult
mother could consent to the minors' use as interpreters. *Id*. at 530, 533–34.

Lange replies that, even assuming she chose to use her minor children as interpreters (an assumption she disputes), the Cities' position misreads the regulation. Lange points out that subsection (a) of the regulation directs a public entity to ensure that communications with individuals with disabilities are "as effective as communications with others," *see id.* § 35.160(a)(1), and subsections (b)(1) and (2) concern how to determine which "type of auxiliary aid or service [is] necessary to ensure effective communication," *id.* § 35.160(b)(1)–(2). As Lange reads the statute, it is in making this preliminary determination concerning the type of auxiliary aid that a public entity should "give primary consideration to the requests of the individuals with disabilities." *See id.* When an interpreter represents the necessary type of aid or service under the above subsections, however, then subsections (c)(1) to (c)(3) of the regulation restrict who may serve as an interpreter. *See id.* § 35.160(c)(1)–(3). As discussed above, subsection (c)(3)—the provision at issue here—identifies the limited circumstance in which a minor child may interpret: an imminent emergency where no interpreter is readily available. *See id.* § 35.160(c)(3). According to Lange, the prohibition contained in 28 C.F.R. § 35.160(c)(3) thus supersedes an individual's request to use her minor children as interpreters. *See In re Gulevsky*, 362 F.3d 961, 963 (7th Cir. 2004) ("[W]hen both a specific and a general provision govern a situation, the specific one controls.").

However, while both sides present compelling arguments, we need not resolve the dispute over these competing readings of the regulation because, as discussed below, even if the instruction was incorrect, it was not prejudicial.

*2.   Whether the Instruction Was Prejudicial*

"Even in the face of legal error, 'a new trial is appropriate only if the [jury] instruction prejudiced the complaining party.'" *Kuberski v. Rev Recreation Grp., Inc.*, 5 F.4th 775, 780 (7th Cir. 2021) (alteration in original) (quoting *Lewis v. City of Chi. Police Dept.*, 590 F.3d 427, 433 (7th Cir. 2009)). "This is true even for 'patently incorrect' instructions." *Id.* (quoting *Gile v. United Airlines, Inc.*, 213 F.3d 365, 375 (7th Cir. 2000)). When evaluating prejudice, "we ask, in light of the other instructions, the evidence, and the arguments advanced by the parties, whether the 'correct message [was conveyed] to the jury reasonably well,' such that the erroneous instruction likely made no difference in the outcome." *Guzman v. City of Chicago*, 689 F.3d 740, 745 (7th Cir. 2012) (alteration in original) (quoting *Gile,* 213 F.3d at 375)).

Under this standard, Lange cannot demonstrate that she suffered prejudice from the district court's jury instruction, even if it was erroneous. The district court correctly instructed the jury that to prevail on her claims, Lange had to prove by a preponderance of the evidence that: (1) she "requested an interpreter or the need for an interpreter was known or obvious," (2) the Cities "unreasonably failed to give primary consideration to her request for an interpreter," (3) as a result, Lange "was unable to effectively communicate with the officers," and (4) in "failing to provide an interpreter, [the Cities] intentionally discriminated against [Lange] based on her disability." Given the totality of the circumstances, the evidence on the record here does not show that Lange satisfied these elements.

Fundamentally, the evidence of intentional discrimination was "simply too thin on this record to warrant a new trial."

*See Kuberski*, 5 F.4th at 780 (quoting *Boyd v. Ill. State Police*, 384 F.3d 888, 895 (7th Cir. 2004)). "[A] plaintiff can establish intentional discrimination in a Title II damage action by showing deliberate indifference," *Lacy v. Cook County*, 897 F.3d 847, 863 (7th Cir. 2018), which requires "both (1) knowledge that a harm to a federally protected right is substantially likely, and (2) a failure to act upon that likelihood," *id.* (internal quotation marks omitted) (quoting *S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 263 (3d Cir. 2013)). In other words, a plaintiff must prove "indifference that is a 'deliberate choice'" by defendants. *Id.* at 862 (quoting *Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334, 344 (11th Cir. 2012)). Lange has not contested the district court's instruction on this element.

The evidence adduced at trial demonstrates that, while the officers here knew that Lange was deaf from past interactions, they also had ample experience communicating with her—effectively, in the officers' view—without an ASL interpreter. As noted, this communication included written notes, lip reading, and some verbalization on Lange's part. Lange's only significant evidence challenging the officers' experience was her testimony that she did not want to rely on those other auxiliary aids in high-stakes interactions with the police—specifically, the four incidents identified in her lawsuit. But the deliberate indifference standard is directed to the *defendants'* state of mind, not the plaintiff's. *See S.H.*, 729 F.3d at 266 (affirming grant of summary judgment based on insufficient evidence of deliberate indifference because "[t]he relevant inquiry is knowledge, and evidence that the [defendant] may have been wrong about [the plaintiff's disability] is not evidence that the [defendant] had *knowledge* that" it was likely violating the plaintiff's rights). Given the officers' understanding of Lange's skills based on their prior interactions,

Lange has not demonstrated that they "*knew* that harm to a federally protected right was substantially likely." *Lacy*, 897 F.3d at 862 (quoting *Liese*, 701 F.3d at 344). Considering the "evidence as a whole," the jury could not have "reached a different outcome had the instructions been correct." *See Kuberski*, 5 F.4th at 780. Mere "speculation that the jury might have decided the case differently if given the proper instruction is insufficient to establish prejudice." *See Gile*, 213 F.3d at 375.

At most, Lange argues that the district court misstated the law regarding one facet of Lange's claims. Lange still had to meet her burden of proof on the remaining elements, which, as noted, she could not. In sum, the jury's outcome would have been unchanged, even had it received Lange's preferred instruction. Accordingly, we conclude that Lange is not entitled to a new trial based on the jury instructions.

### B. Judgment as a Matter of Law

We review de novo a district court's denial of a motion for judgment as a matter of law under Rule 50 of the Federal Rules of Civil Procedure. *Turubchuk v. S. Ill. Asphalt Co., Inc.*, 958 F.3d 541, 548 (7th Cir. 2020). We ask only whether "a reasonable jury would not have a legally sufficient evidentiary basis to find for the [prevailing] party" on the issue at hand. *Lawson v. Sun Microsystems, Inc.*, 791 F.3d 754, 761 (7th Cir. 2015) (quoting Fed. R. Civ. P. 50(a)(1)). We view all evidence at trial "in the light most favorable to the verdict." *Turubchuk*, 958 F.3d at 548. "Although we review the entire record, we do not reweigh the evidence, make credibility determinations, or consider evidence favorable to [Lange] that the jury was not required to believe." *Rapold v. Baxter Int'l Inc.*, 718 F.3d 602, 613 (7th Cir.), *as amended on denial of reh'g and reh'g en banc*

(June 3, 2013). Under this standard, Lange's argument for reversal has an even higher threshold to clear than under the prejudice analysis above.

Lange argues that "[t]he trial record reveals that [the Cities] used Ms. Lange's minor children absent an emergency involving an imminent threat to the safety or welfare of an individual or the public where there is no interpreter." In the absence of any "emergency situation," she argues that the district court had "no legal basis to deny [Lange's] motion for judgment as a matter of law."

Even if Lange is correct that there was no emergency situation, however, as discussed above, the jury still had ample evidence to support a defense verdict. Such a verdict is proper if there was evidence allowing the jury to find that the officers did not make a deliberate choice to deprive Lange of her rights. The jury heard from police officers present during the incidents that Lange could and did effectively communicate through means other than an interpreter. Additionally, several witnesses testified that any inability to communicate resulted from Lange's own uncooperative behavior during her interactions with the police. Even Lange herself testified that she was upset during the encounters. Viewed as a whole, this evidence provides a reasonable basis for the jury's conclusion that the Cities' police officers did not violate Lange's ADA and Rehabilitation Act rights.

## C. Evidentiary Challenge to Detective Crocker's Testimony

Lange next argues that the district court erred by allowing Oconto Police Detective Crocker to testify as to Lange's

contacts with the Cities' police departments other than the four at issue in this case.

Detective Crocker was not present for any of the four incidents, but she testified that she had interacted with Lange on numerous other occasions, and she had been able to effectively communicate with Lange through pen and paper, as well as lip reading and verbal communication. Crocker also testified that, if Lange's minor children were interpreting during one of their interactions, it was because Lange had initiated that method of communication. Detective Crocker specifically recalled that there were occasions when Lange would call one of her children over for the purpose of using them to interpret. Finally, Detective Crocker stated that Lange had 115 total interactions with public agencies in Oconto County (including the two police departments, but also including other agencies like the county or sheriff's office).

Lange contends that the court should have excluded Detective Crocker's testimony as irrelevant to any non-propensity purpose under Federal Rule of Evidence 404. Even if relevant for a permissible purpose, Lange maintains that the court still should have excluded Detective Crocker's testimony as unfairly prejudicial under Federal Rule of Evidence 403.

We review a district court's decision to admit or exclude evidence for an abuse of discretion. *Thompson v. Mem'l Hosp. of Carbondale*, 625 F.3d 394, 403 (7th Cir. 2010). "A decision is an abuse of discretion only if 'no reasonable person would agree with the decision made by the trial court.'" *Smith v. Hunt*, 707 F.3d 803, 807–08 (7th Cir. 2013) (quoting *United States v. Thomas*, 453 F.3d 838, 845 (7th Cir. 2006)). "Even if we found such an abuse of discretion, we would order a new trial

only if there were a significant chance that the ruling affected the outcome of the trial." *Ford v. Marion Cnty. Sheriff's Off.*, 942 F.3d 839, 859 (7th Cir. 2019); *see also Palmquist v. Selvik*, 111 F.3d 1332, 1339 (7th Cir. 1997) ("Disturbing the judgment of the district court on evidentiary grounds is necessary only if an erroneous ruling had a 'substantial influence over the jury.'" (quoting *United States v. Fairman*, 707 F.2d 936, 941 (7th Cir. 1983)).

1. *Whether the District Court Should Have Excluded the Testimony Under Rule 404*

We begin with Lange's challenge under Rule 404. Although Lange cites to Rule 404(a), which provides that "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait," the advisory committee on the Rules of Evidence defines "character" as "a generalized description of one's disposition, or of one's disposition in respect to a general trait, such as honesty, temperance, or peacefulness." Fed. R. Evid. 406 advisory committee's note to 1972 proposed rules (quoting *McCormick on Evidence* § 162 at 340 (1954)); *see also Michelson v. United States*, 335 U.S. 469, 477 (1948) ("What commonly is called 'character evidence' is only such when 'character' is employed as a synonym for 'reputation.'"). Despite her citation to Rule 404(a), Lange's arguments focus on the introduction of evidence of "other acts"— Lange's communications during other incidents—not her character. Thus, Lange's Rule 404 arguments are more appropriately analyzed under Federal Rule of Evidence 404(b),

which excludes evidence of specific acts to show a person's propensity to behave in a certain way.[5]

Rule 404(b) provides that "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). But that rule also provides that "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.* 404(b)(2). Rule 404(b)(2)'s list of non-propensity purposes is "not exhaustive." *United States v. Taylor*, 522 F.3d 731, 735 (7th Cir. 2008).

Although this "rule is straightforward enough, … confusion arises because admissibility is keyed to the *purpose* for which the evidence is offered, and other-act evidence is usually capable of being used for multiple purposes, one of which is propensity." *United States v. Gomez*, 763 F.3d 845, 855 (7th Cir. 2014) (en banc). We have clarified that "the rule allows the use of other-act evidence only when its admission is supported by some propensity-free chain of reasoning." *Id.* at 856. However, "[o]ther-act evidence need not be excluded whenever a propensity inference can be drawn." *Id.* at 860. "[R]ather, Rule 404(b) excludes the evidence if its relevance to 'another purpose' is established *only* through the forbidden propensity inference." *Id.* at 856. Courts must therefore consider not just "*whether* the proposed other-act evidence is

---

[5] Tracking Rule 404(b)'s language, Lange's brief, though citing Rule 404(a), also frames the issue as whether Detective Crocker's testimony about "unrelated acts" evinced Lange's "propensity to use other auxiliary aids to communicate with officers[.]"

relevant to a non-propensity purpose but *how* exactly the evidence is relevant to that purpose—or more specifically, how the evidence is relevant without relying on a propensity inference." *Id.*

With this guidance in mind, it is clear that Detective Crocker's testimony was offered for a non-propensity purpose based on a non-propensity line of reasoning. The district court ruled during the pretrial conference that testimony concerning prior interactions between Lange and the Cities' police officers would be admissible to "show the relationship between the parties" and "explain why and what the defendants were thinking" about why they believed that communication with Lange was effective. The judge also held that the testimony would bear on the plaintiff's credibility as to the extent of her disability and "whether the plaintiff had made clear that her disability required more." At trial when Lange renewed her objection to Detective Crocker taking the stand, the district court reiterated that Detective Crocker would simply "testify as to her ability to communicate with Ms. Lange without using an ASL [interpreter]" and admonished the Cities to "steer clear of … any prejudicial facts[.]" The court further explained that the parties were "free to go into evidence of [Lange's] communication ability" but not "evidence of other acts by Ms. Lange that would unduly prejudice her in the eyes of the jury."

In compliance with that ruling, Detective Crocker did not describe the underlying facts of her prior interactions with Lange; she merely testified that they occurred, and that in her experience Lange could communicate without an interpreter. On cross-examination, Lange's counsel elicited that Detective Crocker did not know whether Lange had been provided an

interpreter or whether she had requested one in any of the 115 incidents where Detective Crocker was not present.

Lange attempts to frame Detective Crocker's testimony as impermissible propensity evidence because it was admitted "for no other purpose than to show the jury Ms. Lange had a history of contacts with both police departments and Ms. Lange had a propensity to use other auxiliary aids to communicate with officers" in violation of Rule 404. The testimony, however, was appropriately addressed to Lange's capabilities and credibility: Lange testified that pen and paper and lip-reading were not effective methods of communicating with her because she did not understand them very well. Detective Crocker's testimony that she had previously communicated with Lange using these methods, and that Lange responded appropriately using these methods, was properly admissible to show that she had a better grasp of reading and writing and lip-reading than she claimed.

Accordingly, the district court did not err in admitting Detective Crocker's testimony concerning her prior interactions with Lange. While the testimony that Lange had 115 interactions with Oconto County public agencies presents a closer question, we cannot say on this record that "no reasonable person would agree with the decision made by the trial court" to admit that evidence. *Smith*, 707 F.3d at 807–08 (citation omitted).

2. *Whether the District Court Should Have Excluded the Testimony Under Rule 403*

Even if we determine that the relevance of Detective Crocker's testimony does not depend on propensity reasoning, we must assess whether the district court still should

have excluded the testimony under Rule 403. That rule per-
mits a district court to exclude other-act evidence if its proba-
tive value "is substantially outweighed by the risk of unfair
prejudice." *Gomez*, 763 F.3d at 860. "Recognizing that 'most
relevant evidence is, by its very nature, prejudicial, we have
emphasized that evidence must be *unfairly* prejudicial to re-
quire exclusion.'" *United States v. Boros*, 668 F.3d 901, 909 (7th
Cir. 2012) (some internal quotation marks omitted) (quoting
*United States v. Hanna*, 630 F.3d 505, 511 (7th Cir. 2010)). "Evi-
dence poses a danger of 'unfair prejudice' if it has 'an undue
tendency to suggest decision on an improper basis, com-
monly, though not necessarily, an emotional one.'" *United
States v. Rogers*, 587 F.3d 816, 822 (7th Cir. 2009) (quoting Fed.
R. Evid. 403 advisory committee's note on proposed rules).
"The amount of prejudice that is acceptable varies according
to the amount of probative value the evidence possesses." *Id.*
For other-acts evidence, specifically, "[t]he court's Rule 403
balancing should take account of the extent to which the non-
propensity fact for which the evidence is offered actually is at
issue in the case." *Gomez*, 763 F.3d at 860. Nonetheless, "[t]he
balancing of probative value and prejudice is a highly discre-
tionary assessment, and we accord the district court's deci-
sion great deference, only disturbing it if no reasonable per-
son could agree with the ruling." *United States v. Thomas*,
321 F.3d 627, 630 (7th Cir. 2003).

Here, the probative value of Detective Crocker's testi-
mony was not substantially outweighed by its prejudicial ef-
fect. Lange's capacity to communicate effectively using aids
other than her children's interpretation (such as pen and pa-
per or lip reading) was a central issue at trial. Detective
Crocker's testimony that Lange had 115 contacts with public
agencies in Oconto County, including the Cities' police

departments, was highly probative of the fact that she was indeed able to communicate effectively through these alternative aids. Though it may have suggested an improper inference regarding Lange's character based on her repeated contacts with the police, again, we cannot say that "no reasonable person could agree" with the district court's decision to admit the testimony. *See id.*

In any event, there is not a "significant chance that the error affected the outcome of the trial" here. *See Smith*, 707 F.3d at 811. As described above, the jury heard testimony from the police officers involved in the four incidents at issue. Those officers testified as to their past ability to communicate with Lange without an interpreter. Lange does not challenge that testimony on appeal. That testimony about Lange's past encounters with the police did not differ substantially from Detective Crocker's testimony, and such evidence reasonably could have led the jury to conclude either that Lange did effectively communicate with the officers or that any fault in achieving effective communication did not result from the defendants' deliberate indifference. Stated differently, other evidence not challenged on appeal provided a strong basis for a defense verdict, and we cannot say that Detective Crocker's testimony in this regard unfairly prejudiced Lange.

### D.  The District Court's Taxing of Costs to Lange

Our final issue on appeal is whether the district court erred in imposing costs on Lange, given her indigence. We review a district court's decision to impose costs for an abuse of discretion. *Richardson v. Chi. Transit Auth.*, 926 F.3d 881, 893 (7th Cir. 2019).

The district court awarded costs to the Cities under Federal Rule of Civil Procedure 54. That rule states, in relevant part, that "[u]nless a federal statute, [the Federal Rules of Civil Procedure], or a court order provides otherwise, costs—other than attorney's fees—should be allowed to the prevailing party." Fed. R. Civ. P. 54(d)(1). "There is a presumption that the prevailing party will recover costs, and the losing party bears the burden of an affirmative showing that taxed costs are not appropriate." *Richardson*, 926 F.3d at 893 (quoting *Beamon v. Marshall & Ilsley Tr. Co.*, 411 F.3d 854, 864 (7th Cir. 2005)). This presumption in favor of awarding costs "is difficult to overcome"; therefore, "the court must award costs unless it states good reasons for denying them." *Id.* (quoting *Weeks v. Samsung Heavy Indus. Co.*, 126 F.3d 926, 945 (7th Cir. 1997)). "Generally, only misconduct by the prevailing party worthy of a penalty or the losing party's inability to pay will suffice to justify denying costs." *Weeks*, 126 F.3d at 945. Lange argues that she falls under the latter exception because she is indigent.

"[T]he indigence exception [under Rule 54(d)(1)] … is a narrow one," and its application is committed to the district court's discretion. *Rivera v. City of Chicago*, 469 F.3d 631, 636 (7th Cir. 2006). When exercising its discretion, a district court must perform a two-step analysis. *Id.* at 635–36. First, the court must "make a threshold factual finding that the losing party is incapable of paying the court-imposed costs at this time or in the future." *Richardson*, 926 F.3d at 893 (internal quotation marks omitted) (quoting *Rivera*, 469 F.3d at 635). "The burden is on the losing party to provide the district court with sufficient documentation to support such a finding." *Id.* (quoting *Rivera*, 469 F.3d at 635). "Second, the district court should consider the amount of costs, the good faith of the

losing party, and the closeness and difficulty of the issues raised by a case … . No one factor is determinative, but the district court should provide an explanation for its decision to award or deny costs." *Rivera*, 469 F.3d at 635–36.

In this case, the district court did not make a specific finding regarding Lange's indigency—instead stating that it would award costs regardless of her indigent status. The court did, however, reduce the amount of costs from the $4,012.97 taxed by the clerk to $1,000 based on Lange's indigency. The Cities do not dispute Lange's indigency on appeal. Furthermore, Lange submitted to the district court an affidavit and "other documentary evidence of both income and assets, as well as a schedule of expenses," as required. *See id.* at 635. Accordingly, Lange satisfactorily demonstrated her indigent status, and we proceed to the second part of the inquiry—the district court's explanation of its decision to award costs.

The district court gave a brief explanation of its decision to award $1,000 in costs to the Cities. Regarding good faith, the court stated that it "[did] not find that [Lange's] suit was frivolous, but" Lange's prior interactions with the Cities' police officers "raises questions about [Lange's] ability to communicate with law enforcement." The court also explained that "[t]he issues presented in this case were not close or difficult, and [Lange] did not succeed on any of her claims." Lastly, the district court remarked that the $1,000 award it imposed would "allow[] [the Cities] to recover a portion of the costs they were forced to incur and imposes a measure of accountability on [Lange]."

On appeal, Lange argues that the district court's decision lacks any basis and that none of the factors warrant imposing

costs on her. We disagree. Addressing first the good-faith factor, the record demonstrates that Lange showed good faith. For instance, the record does not show that Lange filed suit to harass her opponents or abuse the legal process. *See Popeil Bros. v. Schick Elec., Inc.*, 516 F.2d 772, 776 (7th Cir. 1975). That her claims were not frivolous but involved "issues as to which the law is in doubt," *see Chi. Sugar Co. v. Am. Sugar Ref. Co.*, 176 F.2d 1, 11 (7th Cir. 1949), further suggests she brought her action in good faith.

A showing of good faith alone, however, is insufficient to shield a losing litigant from paying costs. *Muslin v. Frelinghuysen Livestock Managers, Inc.*, 777 F.2d 1230, 1236 (7th Cir. 1985); *see also Congregation of the Passion, Holy Cross Province v. Touche, Ross & Co.*, 854 F.2d 219, 221 (7th Cir. 1988) ("[T]he mere fact that the unsuccessful party was an ordinary party acting in good faith and neither harassing its opponent nor abusing legal process is not sufficient to overcome the presumption that the prevailing party is entitled to costs." (quoting *Popeil Bros.*, 516 F.2d at 776)). Therefore, to the extent that Lange argues that her good faith in pursuing her lawsuit alone provides a basis to deny costs to defendant-appellees, we disagree. Instead, Lange's good faith is but one factor in the analysis.

Lange also contends that the closeness and difficulty of the issues raised in her case provide a basis to overcome the presumption in favor of awarding costs. Certainly, "the closeness of a case can be a reason for denying an award of costs to the prevailing party in cases in which the losing party is indigent …." *U.S. ex rel. Pileco, Inc. v. Slurry Sys., Inc.*, 804 F.3d 889, 894 (7th Cir. 2015). To support her position, Lange relies on a Sixth Circuit decision stating that "[t]he closeness of a case is

judged not by whether one party clearly prevails over an-
other, but by the refinement of perception required to recog-
nize, sift through and organize relevant evidence, and by the
difficulty of discerning the law of the case." *White & White,
Inc. v. Am. Hosp. Supply Corp.*, 786 F.2d 728, 732–33 (6th Cir.
1986).

Even applying that standard, however, the district court
did not abuse its discretion in finding that Lange's case did
not present close or difficult issues. A district court "only
abuses its discretion in reviewing a bill of costs if 'no reason-
able person could take the view adopted by the trial court.'"
*Williams v. Off. of Chief Judge of Cook Cnty.*, 839 F.3d 617, 628
(7th Cir. 2016) (quoting *Rivera*, 469 F.3d at 636). The record
here provides a reasonable basis for the district court's find-
ing. While Lange's case involved some unresolved and nu-
anced issues of law, they were not particularly difficult. The
trial lasted only three days and did not require the court,
counsel, or jury to scrutinize vast or complex evidence. Lange
argues that her case was close because it survived summary
judgment. That the district court identified issues of material
fact allowing the case to go to trial, however, does not neces-
sarily mean that those issues were difficult or close at the trial
itself in view of all the evidence. Indeed, the jury deliberated
for less than two hours, providing additional evidence that
Lange's case was not close.

Lastly, Lange argues that the district court's finding that
the reduced award of $1,000 in costs would "impose a meas-
ure of accountability" on her does not justify awarding costs
to the Cities. She also contends that the court should have de-
nied costs because the amount imposed will have a chilling
effect on future civil rights litigants. Lange bolsters her

position with authority from the Ninth Circuit endorsing the denial of costs when their "imposition … on losing civil rights plaintiffs of modest means may chill civil rights litigation[.]" *Stanley v. Univ. of S. Cal.*, 178 F.3d 1069, 1080 (9th Cir. 1999); *see also Ass'n of Mex.-Am. Educators v. California*, 231 F.3d 572, 593 (9th Cir. 2000) ("[D]ivesting district courts of discretion to limit or to refuse such overwhelming costs in important, close, but ultimately unsuccessful civil rights cases like this one might have the regrettable effect of discouraging potential plaintiffs from bringing such cases at all."). Lange again relies on Ninth Circuit authority to make the related argument that the district court ignored the public importance of her case in deciding to impose costs. *See Stanley*, 178 F.3d at 1080 (noting that civil rights plaintiffs may "raise important issues" that "test the boundaries of our laws" and spur "progress").

This out-of-circuit authority is not binding on us. Even if it were, it would not undermine the district court's conclusion. Setting aside that we have not recognized public importance as an appropriate basis for denying costs, *see Weeks*, 126 F.3d at 945 ("Generally, only misconduct by the prevailing party worthy of a penalty or the losing party's inability to pay will suffice to justify denying costs."), the cases Lange cites involved costs many times greater than the award at issue in this case. *Stanley v. University of Southern California* involved an award of $46,710.97 in costs. *See* 178 F.3d at 1080. In *Association of Mexican-American Educators v. California*, the defendants sought an award of $216,443.67. *See* 231 F.3d at 579. Moreover, the amount awarded in Lange's case not only comprised a substantially smaller amount of costs than in the above cases, it also represented a fraction of the amount originally taxed by the clerk's office. Accordingly, we cannot

conclude that the award of costs here represented an abuse of discretion because of the potentially chilling effect on other civil rights litigants or the public importance of the case.

Perhaps anticipating the strong headwinds confronting her challenge to the district court's costs award, Lange turns to other areas of law for support, in particular, the standard that applies to an award of attorney's fees.

Critically, the district court in this case awarded *costs*, not *attorney's fees*. As noted, Federal Rule of Civil Procedure 54(d)(1) provides that costs *other than attorney's fees* "should be allowed to the prevailing party," and "[t]here is a presumption that the prevailing party will recover costs," *Richardson*, 926 F.3d at 893 (quoting *Beamon*, 411 F.3d at 864).

Attorney's fees are addressed separately, in Rule 54(d)(2), which sets forth the procedures for assessing attorney's fees and requires the moving party to "specify the … statute, rule, or other grounds entitling the movant to the award [of attorney's fees]." In its decision in *Christiansburg Garment Co. v. EEOC*, the Supreme Court set forth a higher standard to "inform a district court's discretion in deciding whether to award attorney's fees to a successful defendant" under one such statute, Title VII of the Civil Rights Act of 1964. 434 U.S. 412, 417 (1978) (emphasis omitted); *see also* 42 U.S.C. § 2000e-5(k) (Title VII's fees and costs provision). In *Christiansburg*, the Supreme Court held that Title VII permits the recovery of attorney's fees by a prevailing defendant only when the plaintiff's claim "was frivolous, unreasonable, or without foundation," since "assessing attorney's fees against plaintiffs simply because they do not finally prevail would substantially add to the risks inhering in most litigation and would undercut the efforts of Congress to promote the vigorous enforcement of the

provisions of Title VII." *Id.* at 421–22. *Christiansburg* did not disturb the presumption that a prevailing party should recover *costs* under Title VII and Rule 54(d). *See, e.g.*, *Beamon*, 411 F.3d 854 (holding that "the losing party bears the burden of an affirmative showing that taxed costs are not appropriate" in a Title VII case).

It is well-established that the *Christiansburg* standard applies to an award of *attorney's fees* under the ADA. *See Summers v. Teichert & Son, Inc.*, 127 F.3d 1150, 1154 (9th Cir. 1997); *Adkins v. Briggs & Stratton Corp.*, 159 F.3d 306, 307 (7th Cir. 1998). Lange wishes to take things a step further and contends that we should apply the heightened attorney's fees standard from *Christiansburg* to an award of *costs* under the ADA. The Ninth Circuit has adopted Lange's position, holding that the structure of the ADA's fees and costs provision warrants the extension of the *Christiansburg* standard to an award of costs under the ADA, as well. *See Brown v. Lucky Stores, Inc.*, 246 F.3d 1182, 1190 (9th Cir. 2001). Unlike Title VII, which states that a court may award "the prevailing party … a reasonable attorney's fee (including expert fees) as part of the costs," 42 U.S.C. § 2000e-5(k), the ADA states that a court may award "a reasonable attorney's fee, *including* litigation expenses, and *costs*," 42 U.S.C. § 12205. The Ninth Circuit extended the *Christiansburg* standard to an award of costs under the ADA because the statute "makes fees and costs parallel" in a way that Title VII does not. *Brown*, 246 F.3d at 1190.

We need not decide today whether to adopt this standard, however, because Lange also brought a claim under the Rehabilitation Act. No circuit court, including the Ninth Circuit, has applied the *Christiansburg* attorney's fee standard to an award of costs under the Rehabilitation Act. In fact, when

given the opportunity to do so, the Ninth Circuit declined, concluding that the "parallel structure in the ADA between costs and attorney fees is critically absent from the relevant texts of both the Rehabilitation Act and Title VII." *Martin v. Cal. Dep't of Veterans Affs.*, 560 F.3d 1042, 1052 (9th Cir. 2009). In fact, the Rehabilitation Act's text is materially identical to that of Title VII. *Compare* 29 U.S.C. § 794a(b) (permitting prevailing party to recover "a reasonable attorney's fee *as part of the costs*" under the Rehabilitation Act) and 42 U.S.C. § 2000e-5(k) (permitting a court to award "the prevailing party … a reasonable attorney's fee (including expert fees) *as part of the costs*" under Title VII) *with* 42 U.S.C. § 12205 (permitting court to award "a reasonable attorney's fee, *including* litigation expenses, and *costs*" under the ADA) (emphases added)). The Ninth Circuit thus concluded that "the wording of the [Rehabilitation Act] supports an inference that the general provision in Rule 54(d)(1) of the Federal Rules of Civil Procedure—that costs are allowed in the ordinary course to the prevailing party—applies." *Martin*, 560 F.3d at 1053. We agree.

Accordingly, Lange has not demonstrated a basis in law to require that an award of costs under the Rehabilitation Act satisfy the *Christiansburg* standard. If that standard does not apply, then the district court did not abuse its discretion by awarding costs to the Cities as the prevailing party on the Rehabilitation Act claim, even while finding Lange's claims not frivolous.

Finally, Lange points to our own precedent regarding attorney's fee awards to argue that the district court should not have awarded costs to the Cities because her case involved novel legal issues. For two significant reasons, however, the cases Lange cites do not dictate the outcome

here. First, those cases involved awards of attorney's fees, not costs. *See LeBeau v. Libbey-Owens-Ford Co.*, 799 F.2d 1152, 1156 (7th Cir. 1986), *reh'g denied and opinion modified sub nom. Le Beau v. Libbey-Owens-Ford Co.*, 808 F.2d 1272 (7th Cir. 1987); *Reichenberger v. Pritchard*, 660 F.2d 280, 287–88 (7th Cir. 1981). We have not endorsed considering whether a case presents novel issues as a basis for denying costs. Second, the plaintiffs in those cases brought claims under Title VII and 42 U.S.C. §§ 1983 and 1985—not the ADA or the Rehabilitation Act. *See LeBeau*, 799 F.2d at 1154–55; *Reichenberger*, 660 F.2d at 284. As we have just explained, no court has held that *Christiansburg* applies to costs imposed under the Rehabilitation Act.

"In making a discretionary decision, a court must present an explanation for its choice sufficient to enable a reviewing court to determine that it did not act thoughtlessly, but instead considered the factors relevant to its decision and in fact exercised its discretion." *Patton v. MFS/Sun Life Fin. Distribs., Inc.*, 480 F.3d 478, 491 (7th Cir. 2007). The district court here set forth a reasonable explanation for its decision to impose costs that took the relevant factors into consideration. While room for disagreement exists, the district court did not abuse its discretion. Accordingly, we affirm the court's decision to impose costs.

## III.    Conclusion

For the reasons explained above, the Court AFFIRMS the judgment of the district court in favor of defendants-appellees, the denial of Lange's motion for judgment of matter of law, the decision to admit Detective Crocker's testimony, and the assessment against Lange of $1,000 in costs.